Robert FRANKLIN, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, Defendant.

Civil Action No. 94–0511(JHG).

United States District Court,
District of Columbia.

April 16, 1997.

Jonathan Mark Smith, Aurie Talbor Hall, DC Prisoners' Legal Services Project, Inc., Richard Edward Wallace, Jr., Callie Georgeann Pappas, Kenneth Wellington Brothers, John Justin Rosenthal, Howrey & Simon, Washington, DC, for plaintiffs.

Maria Claudia Amato, Nancy S. Schultz, Jacques Philippe Lerner, Office of Corporation Counsel, D.C., Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

The plaintiffs represent a class of Hispanic prisoners who are or who will be incarcerated in District of Columbia correctional institutions. In this suit, they seek injunctive and a declaratory relief for alleged violations of the First, Fifth and Eighth Amendments to the Constitution under 42 U.S.C. § 1983, of 42 U.S.C. §§ 2000d, 2000bb, and of D.C. law pendent to the constitutional violations.[1]

The plaintiffs allege that the defendant's failure to provide Spanish-speaking staff; interpreters and translators has violated their constitutional rights, because it effectively denies them adequate medical and mental health care and interferes with their right to privacy, obstructs their constitutional right to practice their religion, undermines their right to fair hearings and denies them access to vocational, educational and drug treatment programs. They also aver that the defendant has violated their rights by failing to offer religious, vocational and educational programs in the Spanish-language. And, the plaintiffs contend that the District of Columbia has discriminated against Hispanic prisoners by failing to protect them from racial violence and a racially hostile environment.[2]

---

1. The plaintiffs originally filed this action *pro se*. This Court appointed Howrey & Simon to represent the plaintiffs. The D.C. Prisoners' Legal Services Project, Inc., subsequently entered an appearance on the plaintiffs' behalf. Through *these counsel, the plaintiffs filed an Amended* Complaint adding certain claims. *See* Docket No. 38 (Amended Complaint). The Court sin-

cerely appreciates the willingness of these counsel to provide *pro bono* service to the plaintiffs.

2. This Court previously granted the defendant's motion for partial summary judgment on the plaintiffs' constitutional claim that the defendants violated their rights as a result of the Department of Corrections' policy barring pris-

The plaintiffs have met their burden to prove that the defendant has violated the plaintiff class' constitutional rights under the Eighth and Fifth Amendments, as alleged in Counts One through Four of the Amended Complaint, and, notwithstanding the "flurry of activity" on the eve of trial, the defendant has not taken meaningful action to remedy those violations. Accordingly, for the reasons stated below, upon considering all of the evidence introduced at trial and the testimony of the witnesses, including an evaluation of the credibility and demeanor of each witness, the Court will enter judgment in favor of the plaintiffs on Counts One (in part), Two, Three and Four of the Amended Complaint and in favor of the defendant on Counts One (in part), Five, Seven and Eight.[3]

## I. Introduction

The five-day bench trial in this matter involved approximately 30 hours of trial time, evenly divided between both sides.[4] In its case-in-chief, the plaintiffs presented five Limited–English–Proficient ("LEP") Hispanic inmate witnesses (William Alexander Lazo, Jose Mejia, Jose Bonilla, Martin Nunez, and Jose el Carmen Sandoval); Sister Maria Lapazaran (a Carmelite nun serving as a full-time volunteer with the Department of Corrections); Ottoniel Perez (a pastoral volunteer of the Catholic Archdiocese); Rosalyn Overstreet–Gonzalez (a staff attorney with the D.C. Public Defenders Service Prisoners' Rights Program); E. Eugene Miller (an expert on correctional issues); Sonia Oquendo, M.D. (an expert on correctional mental health issues); Joseph Fowlkes, M.D. (an expert on correctional medical issues); Vilma Iraheta–Oliva ("Iraheta") (a bilingual case manager with the Department of Corrections); and Laura Colon (the coordinator for the Limited–English–Proficient Program at the Department of Corrections). The plaintiffs also offered deposition designations and counterdesignations pursuant to Fed.R.Civ.P. 32,[5] and they introduced 296 exhibits at

oners from being transferred to minimum security if those prisoners had detainers issued against them by the Immigration and Naturalization Service. *See Franklin v. Barry,* 909 F.Supp. 21, 27 (D.D.C.1995). Subsequently, the plaintiffs voluntarily dismissed their claims against the individual defendants named in the original Complaint and from whom monetary damages had been sought. The only remaining defendant in this case is the District of Columbia. *See* Order of May 20, 1996 (Docket No. 150).

3. The plaintiffs have withdrawn Count Six of the Amended Complaint, in which they contended that they were denied meaningful access to the courts due to the defendant's failure to stock the law library with Spanish language legal materials or to provide Spanish-speaking law librarians or law clerks. *See* Proposed Conclusions of Law at 2 n. 1 (citing *Lewis v. Casey,* —— U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

4. The parties were advised of this time allocation well prior to trial. *See* Order of March 12, 1996 (Docket No. 137) (setting five-day trial); Order of March 21, 1996 (Docket No. 141) (rejecting the defendant's request that it be allotted the majority of the 5–day trial time for its case and memorializing the parties' agreement to submit their experts' direct testimony in writing in order to save time at trial); Transcript of Hearing at 35–36 (May 16, 1996) (allocating trial time equally between the parties); Order of May 16, 1996 (Docket No. 116) (same). *See generally Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 609 (3rd Cir.1995) ("courts have discretion to impose limits on a party's trial presentation"). Additionally, as another means of conserving tri-

al time, the Court read in Chambers post-trial the voluminous deposition transcripts to which the parties designated and counterdesignated. *See infra* nn. 5 & 8.

After trial, the defendant filed its "Offer of Proof of Precluded Testimony." See Docket No. 205. Contrary to a statement in that proffer, the Court did not invite or otherwise authorize the filing of this pleading, and the plaintiffs have moved that it be stricken. *See* Docket No. 209. The record makes crystal clear both that the parties had adequate notice regarding the trial time each was allocated and the decisions each party made in deciding how to use its time at trial. While the Court will not strike the defendant's post-trial Offer of Proof of Precluded Testimony, it was not considered in resolving this matter.

5. The plaintiffs offered testimony from inmate-witnesses through deposition designations pursuant to Fed.R.Civ.P. 32(a)(3) (Ulises Artola, Milton Benavides, Martha Gaviria, Jose Grande, Victor Lugo, Victor Maldonado, Jose Ramos, Pedro Redman, Orlando Suazo, Nicholas Vazquez, and Mario Vilche) and from Department of Corrections representatives pursuant to Fed.R.Civ.P. 32(a)(2) (Patricia Britton–Jackson, Laura Colon, William Hall, Vernon Hawkins, Vilma Iraheta, John Noble, William Plaut and William Vazquez). *See* Plaintiffs' Praecipe (June 26, 1996), incorporating by reference attachment 3 (various affidavits) to Plaintiffs' Revised Deposition Designations (June 19, 1996).

The plaintiffs exercised due diligence to locate certain inmate and former inmate witnesses, *see*

trial.[6]

In its case, the defendants offered trial testimony from three fact witnesses and from one expert: Bernard Braxton (Deputy Director of the Department of Corrections); Laura Colon (see supra); Michael Green (Director for the Division of Parole Determination Services); and Dr. John Clark (expert witness).[7] The defendant offered deposition designations and counterdesignations,[8] and it offered 381 exhibits.[9]

## II. Findings of Fact

The District of Columbia Department of Corrections currently operates eight correctional facilities which house approximately 9,000 inmates.[10] These institutions are:

id. at attachment 3, and the Court is satisfied that the plaintiffs have shown that inmates Benavides and Vilche and former inmates Gaviria and Ramos were unavailable at the time of trial pursuant to Fed.R.Civ.P. 32(a)(3). Id. However, the plaintiffs have failed to demonstrate the unavailability of former inmates Artola (on parole), Bonilla (testified at trial), Grande (no information on unavailability provided), Lugo (no information on unavailability provided), Maldonado (no information on unavailability provided), Redman (on parole), Suazo (on parole), and Vazquez (no information on unavailability provided). And, unlike their showing regarding their efforts with respect to inmate Benavides' lack of availability, the plaintiffs offered no evidence that they attempted to contact the parole officers of former inmates Artola, Redman or Suazo. While former inmates released from the correctional system who are not on parole may be unavailable, former inmates on parole are presumably in contact with their parole officers. Absent a showing to the contrary, the latter individuals cannot be considered unavailable within the meaning of Rule 32(a)(3). However, as requested by the plaintiffs, the Court has considered the depositions of the following inmates and former inmates as counterdesignations pursuant to Fed.R.Civ.P. 32(a)(4): Artola, Benavides, Bonilla, Gaviria, Grande, Lugo, Maldonado, Ramos, Redman, Suazo and Vilche. See Plaintiffs' Objections and Counterdesignations to Defendant's Deposition Designations at 2 (incorporating by reference and adding their original designations as counterdesignations).

6. Several exhibits included numerous subparts. See, e.g., Plaintiffs' Exhibit ("PE") 288 (32 subparts); PE 289 (15 subparts); PE 290 (21 subparts); PE 293 (13 subparts). The parties entered into a stipulation as to PE 294, attached to that exhibit. And, while the defendant reserved its right to object to hearsay contained within specific exhibits, the parties stipulated that both the defendant's and plaintiffs' trial exhibits were authentic business records of the District of Columbia. Trial Transcript ("TR") at 6–7 & 679.

**D.C. Detention Facility** ("D.C.Jail")—a high security facility that primarily holds inmates awaiting trial or transfer to one of the defendant's other correctional facilities. At the time of trial, there were 63 Hispanic inmates at the D.C. Jail.

**Correctional Treatment Facility** ("CTF")—a reception, diagnostic and treatment assessment center that is immediately adjacent to the D.C. Jail. At the time of trial, there were nine Hispanic inmates at CTF.

**Central Facility** ("Central")—a medium-security facility, which typically houses inmates within five years of release. At the

7. The Court ruled at trial that Dr. Clark's expert testimony would be limited to the facilities he inspected (Occoquan, Central, D.C. Jail and CTF), his specific expertise as an OBGYN, and his expertise on general administration as the chief medical officer for the Los Angeles County Sheriffs Department. TR at 1095–97. Dr. Clark was barred from offering lay testimony regarding matters outside his expertise, including the adequacy of mental health care, and the Court precluded admission of his report as hearsay. Id at 1093–99.

8. The defendant offered affirmatively the deposition designations of inmates "Jose Arevalo, Ulises Artola, Milton Benavides, Jose Bonilla, Jose Duarte, Martha Gaviria, Jose Grande, Victor Maldanado (sic), Pedro Redman, Jose Ramos, Nicholas Vazquez and Mario Vilche." Defendant's Deposition Designation and Objections to Plaintiffs' Deposition Designations at 4. Other than the Arevalo and Duarte depositions, which were not actually filed with the Court, these deposition designations were considered pursuant to Fed.R.Civ.P. 32(a)(2) (deposition of a party). The Court also considered the defendant's counterdesignations for Patricia Britton–Jackson, Laura Colon, William Hall, Vernon Hawkins, Vilma Iraheta–Oliva, John Noble and William Plaut. The Court did not consider the defendant's proposed counterdesignations for deposition designations that were later withdrawn by the plaintiffs, see Praecipe Regarding Plaintiffs' Withdrawal of Affirmative Deposition Designations at 2–1, and the Court rejects the defendant's attempt to counterdesignate the deposition of Mark Levitt as a proper counterdesignation to the plaintiffs' deposition designation of William Vazquez. See Fed.R.Civ.P. 32(a)(4).

9. Defendant's Exhibit ("DE") 230 consisted of 72 subparts.

10. A ninth facility, the Modular Facility, was closed in November of 1995.

time of trial, Central had 16 Hispanic inmates.

**Maximum Facility** ("Maximum")—a maximum-security facility. At the time of trial, Maximum held nine Hispanic inmates.

**Medium Facility** ("Medium")—a medium-security facility that normally houses inmates within five years of their release. At the time of trial, Medium had approximately 700 inmates, ten of which were Hispanic.

**Minimum Facility** ("Minimum")—the least restrictive of the facilities at Lorton, which at the time of trial, had seven Hispanic inmates.

**Occoquan Facility** ("Occoquan")—a high/medium-security facility. At the time of trial, Occoquan held 43 Hispanic inmates.

**The Youth Center** ("Youth Center")—a facility for Youth Rehabilitation Act offenders and other less violent young adults. At the time of trial, 30 Hispanic inmates were incarcerated at the Youth Center.

Through the testimony of the plaintiffs' correctional expert, Mr. Eugene Miller,[11] the plaintiffs established that, as of the date of trial, 188 Hispanic prisoners were incarcerated in the various institutions of the Department of Corrections, and that the number of Hispanic inmates was expected to increase in future years.[12] *See* Miller Direct Testimony ("Miller Test.") at 4–6. While this number represents approximately 2% of all inmates, it also represents a 33% increase in Hispanic inmates incarcerated within DCDC institutions since 1994. The majority of these Hispanic inmates are from Central America, which the evidence at trial established as significant: Unlike Hispanics from Puerto Rico, Hispanics from Central America typically have little or no exposure to English or the way of life in the United States.[13] Even more problematic, of the Hispanic inmates in the D.C. Department of Corrections institutions, approximately eighty (80) percent do not speak English sufficient to function effectively on a daily basis.[14] Miller Test. at 4 & 35; *see also* TR at 772 & 814 (testimony of Laura Colon).

The defendant's awareness of issues in the Hispanic community generally and of Hispanic issues in its correctional institutions in particular was substantially heightened in May of 1991 as a result of a civil disturbance in the Adams Morgan and Mount Pleasant areas of the District of Columbia. Shortly

11. Understandably, the defendant did not challenge Mr. Miller's qualifications as an expert on correctional issues. *See* TR at 435. Previously, he had served as a warden at the D.C. Women's Detention Center, administered the correctional system for the State of Alaska, and served as Superintendent for the largest prison in New England. TR at 510–11. He has inspected more than 800 prisons and jails, and he has been qualified as an expert in 19 different federal courts. TR at 516. In the past eight years, he has been retained in three different cases as an expert witness by, and on behalf of, Defendant District of Columbia's Department of Corrections. TR at 511–12. Mr. Miller clearly established at trial his extensive familiarity with the defendant's facilities. TR at 510–17.

12. *See also* TR at 571 (testimony of Laura Colon); PE 23, DCDC Task Force Report on Ethnic Minority Population at 2 (July 15, 1991) ("DCDC Task Force Report") ("The ethnic minority population has dramatically grown in the Washington Metropolitan Area, and surrounding jurisdictions of Northern Virginia and Maryland. Unfortunately, the Department of Corrections has shown a similar growth in the number of ethnic minorities committed to its custody during the past five years. . . . The Latinos are the largest ethnic minority group within the institutions who are limited-English proficient.").

13. Mr. Miller's direct testimony in this regard was based in part upon information provided by a Department of Corrections employee, Scott Einhorn, a former police officer, DCDC employee since 1982 and who was then teaching at Medium. *See* Miller Direct Testimony ("Miller Test.") at 4; *see also* DCDC Task Force Report at 2.

14. Additionally, Mr. Miller based his conclusion on an interview with Yvonne Rogas–Roberts, a psychologist employed by DCDC since 1983, who stated that in over 13 years at DCDC, "she ha[d] seen only two Hispanics who could fully function in English and do 'C'd grade work in English-language courses." She explained that only about half of the Hispanic inmates could even communicate in English regarding basic functions and needs; the other half were essentially non-functional in English. She added that "virtually none of the Hispanic inmates in DCDC [correctional institutions] could understand English language subtleties such as the expression 'I feel blue.'" Miller Test. at 4–5.

thereafter, the Department of Corrections organized its Task Force on Ethnic Minority Population to address the services to the Latino population within the D.C. correctional institutions. On July 15, 1991, the DCDC Task Force issued its report, finding:

> Recognizing the potential increase in the population that may exist, *it is important to insure that programs are either expanded or new ones developed to meet the basic health, mental health, and educational needs.*
>
> Effective communications with each ethnic minority group, especially Latinos, is necessary to facilitate a rehabilitation process. *The need for comprehensive and standardized language and cultural programming opportunities is evident.* Appropriate programming will enhance staff and inmate sensitivity and minimize misrepresentation and the risk of confrontation based on misinterpretation. *Thus, greater focus will be given to this group.*

DCDC Task Force Report at 2 (emphasis added).

The Task Force recognized that "limited English speaking inmates are not afforded the opportunity to participate because of the language barrier and the lack of sensitivity to their needs by the system." *Id.* at 3. The major operational concerns identified in the DCDC Task Force Report included:

- the ability to fully participate in the Department's orientation program;

- the ability to identify the specific needs of the limited-english proficient inmate;

- the ability of the LEP inmate to seek appropriate mental health services because of the lack of bilingual psychiatric staff;

- the ability of the LEP to seek medical appropriate medical services because of the lack of bilingual medical personnel;

- the ability of the LEP inmate to participate in educational and vocational programs because of the lack of bilingual staff and materials;

- the ability of the LEP inmate to have their spiritual needs addressed; and

- the ability of the LEP inmate to participate fully in institutional and community-based programs due to language barriers. *Id.* at 3.

Also in response to the Mount Pleasant disturbance, the defendant formed the D.C. Latino Civil Rights Task Force. In October of 1991, this task force issued its report and final recommendations, entitled "The Latino Blueprint for Act." *See* PE 26 ("Latino Blueprint"); TR at 787. In this report, the Latino Civil Rights Task Force identified the lack of services provided to the Latino community and specifically pointed out the failure to recruit and hire bilingual/latino personnel in agencies of the D.C. government. *See* PE 26, Latino Blueprint at 12.

Pursuant to the mayor's direction, each agency of the District of Columbia provided an assessment and a time line for implementing the relevant recommendations of the report. By cover memo of February 3, 1992, Director Walter B. Ridley provided DCDC's response and identified his point of contact as Vernon Hawkins, Chief, DCDC Special Needs Programs. *See* PE 35, Ridley memorandum with attachment, DCDC Latino Blueprint Report ("DCDC Latino Blueprint Report" or "Report"). The Report was authored by the defendant's principal witness and the DCDC representative at trial, Laura Colon, who in November of 1991, had been hired as the Coordinator for DCDC's Limited–English–Proficient Program ("LEP Program"). TR at 569. In the Report, the defendant acknowledged that "the need for comprehensive and standardized language, and cultural programming for Hispanics has been clearly documented." DCDC Latino Blueprint Report at 1, attached to PE 35 (Ridley memorandum).

The United States Civil Rights Commission also issued a report after it conducted an investigation into the underlying causes of the Mount Pleasant disturbance, the continuing violations of the civil rights of Latinos, and the system-wide failure by the District to provide social services required by the Latino Community. *See* PE 68, "Racial and Ethnic Tensions in American Communities: Poverty, Inequality and Discrimination, Volume I: The Mount Pleasant Report," (January

1993) ("U.S. Commission on Civil Rights Report on Racial and Ethnic Tension" or "U.S. Civil Rights Commission Report"). The U.S. Civil Rights Commission Report stated that "[n]either the District's own limited political representation, nor the constraints placed on its ability to collect revenues and pay for the needs of its citizens should in any way hamper its ability to address the civil rights concerns of its Latino minority." *Id.* at iii (Preface).

A particular section of the U.S. Commission on Civil Rights Report on Racial and Ethnic Tension was dedicated to the D.C. Department of Corrections, *see id.* at 73–75, and specific emphasis was placed on the lack of interpreters in DCDC correctional institutions. *Id.* at 74. As reflected in this report, the Department of Corrections acknowledged the language barriers for Spanish-speaking inmates and identified its concern that this barrier prevented Hispanic inmates from acquiring good time credits. *Id.* And, contrary to evidence developed at this trial, but consistent with the District's claim, the U.S. Civil Rights Commission Report states that "there has been an active recruitment process to hire additional Spanish-speaking staff for positions as psychologists, chaplains/chaplain assistants, medical personnel, correctional supervisors, and correctional officers to meet the needs of the limited-English population as it continues to increase." *Id.* at 75.

Ms. Colon, her supervisors and other DCDC staff, as well as volunteers at the correctional institutions, were keenly aware of the problems facing LEP Hispanic inmates within the DCDC system. In January of 1992, Colon met with approximately 30 DCDC staff members, who told her that when they had to help or work with inmates, they were unable to understand them or

their needs. *See* TR at 577. At the meeting, Colon was advised that

> there were comments on the quantity of bilingual staff available at the intake level and at the facility level. There was the clear perception of the need for bilingual staff at all levels to assist in the residents' adjustment.

PE 32 ("ESL Program Meeting at Occoquan Facility," dated January 13, 1992) (this document was prepared by Mr. Oscar Colon, the DCDC Chapter I Coordinator and Laura Colon's husband); *see also* TR at 576.

Colon communicated her concerns up the chain of command. In her memo of October 10, 1992, she advised Hawkins that "[t]he language proficiency of the [Hispanic] residents [at Central] is such that the majority of the residents are need in of an interpreter." PE 58 at 1; *see also id.* at 2. ("Out of the total 24 Hispanic residents, 19 residents are in need of an interpreter."). Colon developed the very same conclusion regarding Hispanic inmates at D.C. Jail, Occoquan and Modular. TR at 581. She also advised her chain of command that Hispanic inmates believed that they were being mistreated or taken advantage of because of their inability to speak English.[15] *See, e.g.,* PE 51 (Colon memo to Hawkins, dated July 1, 1992); *see also* PE 42 (Colon memo to Hawkins, dated March 1992) (reporting that Hispanic inmates at D.C. Jail "feel that they are being discriminated against.").

Colon also advised Hawkins that "[t]here is a desperate need for Spanish programs for the residents." PE 58 at 2. She explained that "[t]he following programs are not only necessary but required in order for the resident to be considered for parole:

1. Substance Abuse Program

2. N.A. (Narcotics anonymous)

---

**15.** "Residents expressed the fact that various officers were disrespectful and mistreated or took advantage of them apparently because they were monolingual versus those who were able to speak the English language and could defend themselves." PE 51 at 5 (Colon memo to Hawkins dated July 1, 1992). Although this portion of Colon's memo addressed complaints by Hispanic residents at Occoquan, Martha Gaviria, a female Hispanic inmate who had been pregnant and incarcerated at CTF both before and after the

delivery of her baby, expressed a similar concern when she was deposed by defendant's counsel:

> Q: (Maria Amato, Esq.): And, is it your contention, then, that you were not allowed to see your baby because you are Hispanic?
> A: Yes, because I couldn't speak English and defend myself like they [English-speaking inmates] can do it.

Deposition of Martha Gaviria, Dep. TR at 27 (Dec. 20, 1994).

3. A.A. (Alcoholics anonymous)

4. Life Skills Programs

5. Mental Health Class

6. Counseling—Psychological/Psychiatric."

*Id.*

Colon requested an appointment with Hawkins to address these matters. *Id.* Nevertheless, as of the trial almost four years later, none of these programs was available at Central (16 Hispanic inmates), Minimum (seven Hispanic inmates), Maximum (nine Hispanic inmates), D.C. Jail (63 Hispanic inmates) or the Youth Center (30 Hispanic inmates). TR at 585–86 (testimony of Laura Colon). And, only Life skills, Narcotics Anonymous and Substance Abuse were offered at Occoquan. *Id.* at 586. Thus, as of the date of trial, of the programs for which Colon identified a desperate need, none was available to approximately 60 percent of the LEP Hispanics in DCDC correctional facilities. TR at 933–94 (testimony of Laura Colon).[16]

Laura Colon was not the only person who advised DCDC of the problems faced by Hispanic inmates. Sister Maria Lapazaran ("Sister Maria"),[17] a nun with the Carmelite Sisters of Charity and full time volunteer at DCDC correctional institutions since 1989, repeatedly provided notice to the defendant regarding the lack of programs and bilingual staff and interpreters, as well as reports of inadequate medical care for Hispanic inmates. *See, e.g.,* PE 13–21, 24, 29, 41, 43, 48, 63, 66, 69, 81, 88, 197, 217, 286 and 295. On April 24, 1991, Sister Maria wrote to Vernon Hawkins, Chief of Special Needs, Office of Programs, DCDC:

> I would like to express to you my concerns about the lack of programs in Lorton for the Spanish-speaking residents.
>
> As you can see in the copy of the testimony I gave in front of the Judiciary Committee, there is not [a] program in Occoquan except the ones that I have organized.

> Some examples; considering how important it is for foreign people to learn English. One or two bilingual teachers for English and GED are a necessity.
>
> Another important and mandatory program is D.A.A.T.P. (Drug Abuse Alcoholic Treatment Program) where it is imperative to have a bilingual counselor.
>
> Many of the Spanish-speaking residents lack job skills. Thus, it is very important to also have vocational programs.
>
> Bilingual Physical and Mental Health Professionals, Case Management, and Officers are also crucial for these inmates.
>
> I feel comfortable in communicating my concerns to you. *As you hold a position of leadership* in special needs, you will appreciate my care of these men who have equal right[s] and needs as human beings.

PE 17 (emphasis added); *see also* TR at 48 (Sister Maria testified that she wrote Hawkins in order to explain the general needs of Hispanic inmate population); PE 13 (letter to Edmund Walsh, Assistant Administrator of Programs at Medium, dated Apr. 1, 1990) (identifying bilingual psychiatrist who was available); PE 14 (memo to Thomas Parker, Assistant Administrator at Occoquan, dated Nov. 15, 1990) (identifying bilingual counselor for Spanish-speaking DAATP); PE 16 (letter to Gwen Washington, Associate Director for Programs, dated March 3, 1991) (confirming that good time credits will be available for Spanish-speaking inmates who take ESL program at Occoquan); PE 18 (letter to Bernard Braxton, Administrator at Occoquan, dated April 30, 1991) (requesting meeting to describe complaints of Hispanic prisoners against officers and other prisoners); PE 19 (memo to Laplois Ashford, Principal of the Education Bldg., Occoquan, dated May 11, 1991) (explaining that volunteer ESL program was ending and describing hope that bilingual teacher will be hired); PE 20 (memo to Bernard Braxton, Administrator at

---

16. Even excluding D.C. Jail, where no programs were offered to any inmates, it is clear that a significant percentage of LEP Hispanic inmates have no opportunity to earn good-time credits due to the language barrier.

17. Sister Maria's volunteer service at DCDC correctional facilities is full-time (i.e., 40 hours/week). TR at 41–42. Although, her office is at Occoquan, she provides services for Hispanic inmates throughout DCDC facilities. *Id.* at 42.

Occoquan, dated May 11, 1991) (describing need for a bilingual counselor in the DAATP program); PE 24 (letter to Bernard Braxton, Administrator at Occoquan, dated July 24, 1991) (describing incident in which doctor directed medical attention but guard denied inmate access to medical care system); PE 29 (memo to Bernard Braxton, Administrator at Occoquan, dated Nov. 11, 1991) (regarding housing of majority of Hispanic prisoners in the "worst dorm" at Occoquan); PE 41 (memo to Walter Ridley, Director, DCDC, dated March 16, 1992) (identifying lack of bilingual psychologists, psychiatrists, doctors, case managers, counselors); PE 43 (letter to Lillie Parker, Assistant for Academic Programs at Lorton, dated April 15, 1992) (identifying Hispanic inmates' concerns with the ESL program and their difficulty in getting an ID card to attend class); PE 48 (letter to Bernard Braxton, Administrator at Occoquan, dated June 4, 1992) (confirming Spanish-speaking residents are in same condition as described in her memo of last November—a specific complaint was raised about Dorm # 6, "the worst in the Occoquan facility").

Despite the fact that the defendant was placed on notice as described above (and as discussed in other portions of this opinion), the District of Columbia has failed to take meaningful action. Among other problems, the claims of deficient medical care, psychiatric and psychological treatment and counseling went unresolved, TR at 49, and the general treatment of Hispanic prisoners has remained the same or worsened. *Id.*

This is not to say that, in light of the overwhelming record establishing notice of the constitutional violations of the rights of Hispanic inmates, the defendant did not react. Some steps were taken, and the defendant adopted some of the recommendations identified in the DCDC Task Force Report. *See* PE 23; TR at 575.[18] At trial, the defendant contended that the recommendations in the Report were accomplished by the end of 1992. TR at 788, 913.[19] However, the evidence at trial made clear that only a limited number of the recommendations were actually accomplished; the remainder were adopted on paper only and have not been implemented meaningfully or enforced regularly, if at all, by the Department of Corrections. For example, while it took over two years to even develop a written policy on providing interpreters, *see* PE 198, the evidence at trial firmly established that the policy is one on paper only—it seldom is followed. Other examples, include the defendant's reluctant embrace of its own programs to provide bilingual coordinators[20] and bilin-

---

**18.** Laura Colon described the steps taken initially. Among those taken, she testified that: she was hired as the Coordinator for the Limited English Proficient Program; one bilingual psychologist for the Department was identified; two bilingual case managers were hired (Ms. Iraheta was already on staff, but detailed and eventually assigned to be the bilingual case manager at Occoquan until her transfer in 1996 following a death threat); and the Department began to identify Spanish-speaking correctional officers; bilingual coordinators were identified. TR at 600–609. Two years after she was hired, a document was issued regarding the procedures for obtaining interpreters. *See* TR at 604; PE 198.

**19.** In response to inquiries from the Latino Task Force and the U.S. Commission on Civil Rights, DCDC produced document after document pointing to the same limited steps upon which it primarily relied at trial. *See, e.g.,* PE 70, 85, 120.

**20.** Laura Colon testified that a bilingual coordinator is a person who serves as an interpreter on an as-needed basis. Colon testified that she determines whether a person is competent to be a bilingual coordinator and that these coordinators are also tasked with explaining procedures to inmates upon intake and administering the defendant's language assessment test, which was first developed shortly before trial. TR at 818–20. The duty of being a bilingual coordinator is a collateral, not a primary, duty, TR at 988. Bilingual coordinators are identified on the Department of Corrections' Master Roster list. *See* PE 256; TR at 825 & 830.

However, while the concept sounds good, Colon admitted that as of November 1994, the bilingual coordinator process was not working due to a lack of training. TR at 972–73. And, although Colon identified lack of training as a problem in 1994, no training was conducted for bilingual coordinators until 18 months later—shortly before trial. TR at 976. Moreover, confusion appears to reign regarding the existence and/or identities of the bilingual coordinators at various institutions, *see* TR at 975–77; TR at 366–76; PE 242; Hall Dep. TR *passim* (deposition of Dec. 94), and the plaintiffs' expert opined at trial that the policy is just not carried out in practice. Miller Test. at 30–31.

gual case managers,[21] and the inexplicable delays in translating documents into Spanish as well as the failure to even distribute documents that had been translated into Spanish years ago. The evidence also made clear that, contrary to the defendant's statements that were apparently offered for public consumption, recruiting bilingual staff has not been a priority. Similarly, the "policy" of concentrating Hispanic inmates at Occoquan and Central is a phantom policy—neither senior DCDC officials nor the bilingual case manager for Hispanic inmates at Occoquan were aware of its existence, and the actual distribution of Hispanic inmates indicates that this policy, too, is honored in the breach.

While the defendant offered evidence regarding a flurry of activity within the Department of Corrections in the weeks prior to trial, the record as a whole establishes that these meager steps, taken five years after the District was placed on notice of the underlying problems, were nothing more than a weak attempt to shield its deliberate indifference from judicial scrutiny once it became clear that this case was going to trial.[22] In any event, the Court has no confidence that these actions, taken on the eve of trial, were sincere attempts to deal with the violations of LEP Hispanic inmates' constitutional rights.

■ Long after the end of 1992, LEP Hispanic inmates were still being deprived of interpreters in hearings and at medical and mental health encounters. Where the record clearly establishes deliberate indifference or other constitutional violations, the defendant cannot hide behind a paper shield of departmental orders or program statements that are seldom, if ever, followed.

## A. Medical and Mental Health Care.

The evidence at trial established that LEP Hispanic inmates have difficulty accessing the medical and mental health care system. Moreover, if and when they are able to do so, the treatment that they receive is inadequate and, at times, unsafe. *See, e.g.,* TR at 110–11 (testimony of William Alexander Lazo). Since at least 1991, Hispanic inmates, defendant's employees and volunteers have complained about the inability of LEP Hispanic inmates to access the DCDC medical care system. *See, e.g.,* TR at 44 (testimony of Sister Maria); PE 42 (Laura Colon memo to

21. The case manager plays a central role in managing the individual inmates, serving as the broker and brokering the identified needs of inmates with available program services and resources within the institution. TR at 524–25; PE 287 at II–C–7 (DCDC Case Management Manual). Simply put, the case manager is the resource for inmates in dealing with the institution. *Id;* TR at 524. At the time trial commenced, however, DCDC has only one bilingual case manager-Ms. Dutton, who is assigned to Central. Ms. Iraheta had been the bilingual case manager at Occoquan, but was reassigned to the Youth Center in early 1996 after receiving an anonymous note threatening her with death. Like most of its programs, DCDC's bilingual case manager concept sounds good on paper, but the evidence at trial indicated that it just has not been implemented in a meaningful sense.

22. After this Court set the trial date in this matter and shortly before trial, the defendant conducted what the plaintiffs have accurately characterized as a flurry of activity. *See* TR 478. The following colloquy occurred at trial:

Q: Now, it is true, is it not that beginning in the middle of March the Department of Corrections began a flurry of activity to try to address some of the issues that were raised in this lawsuit?

Ms. Amato: Objection.
The Court: Objection to what?
Ms. Amato: Vague.
The Court: Vague?
Ms. Amato: Yes, was it—
The Court: Flurry of activity, all right. What did the Department do since the beginning of March in reference to this lawsuit? Was it a flurry of activity?
The Witness (Mr. Braxton): Corporation counsel met with us and said that *it doesn't look like this suit will be a consent. so we've got to move forward to do some of the things that we promised we would do* and check on those things that haven't been done, and let's get on track with it basically is what happened.
TR at 748–49 (emphasis added); *see* PE 230; PE 244.

During this "flurry of activity," the defendant compiled a list of all Hispanic inmates in its institutions; revised its master roster of bilingual employees; trained bilingual coordinators (years after the concept was purportedly implemented); trained staff regarding the AT & T language line; appointed health and mental health service coordinators; designed and administered the language assessment test; color coded medical charts as to Hispanic inmates' language proficiency, and identified a possible bilingual teacher for the Youth Center and a possible case manager for CTF.

Vernon Hawkins, dated March 1992) ("There are no medical staff who are bilingual."); PE 67 (inmate grievance); PE 71 (inmate grievance); PE 88 (Sister Maria letter to Dr. Marzbou, Chief, Occoquan Medical Unit, dated May 17, 1993); PE 115 (inmate grievance); PE 141 (Iraheta memo to Robert Reeder, Assistant Administrator for Programs at Occoquan, dated May 12, 1994) ("Some residents had problems getting medical care, medication or medical supplies."); Deposition of Martha Gaviria (October 21, 1994), Dep. TR at 10–11 (difficulties obtaining prenatal medical care while incarcerated at CTF); Deposition of Mario Vilche (January 11, 1995), Dep. TR at 66–70 (unable to obtain dialysis treatment on a regular basis). Even those who have been treated are not provided with adequate information (in a language they understand) regarding the diagnosis, the treatment plan, if any, and the possible side effects of medication that medical staff prescribe. Sadly lacking for LEP Hispanic inmates is continuity of care.

This deficient medical care arises generally from the lack of bilingual staff and/or the

staff's ignorance of or their repeated failure to follow DCDC's own directives on the provision of interpreters for medical encounters.[23] The plaintiffs' expert on the delivery of medical services, Dr. Joseph P. Fowlkes,[24] testified persuasively that the "medical care services available to Hispanic prisoners who are not fluent in English are severely inadequate. Hispanic prisoners are denied necessary medical treatment because there is no program in place to insure that they can communicate with their medical providers, which limits their ability to gain access to medical services throughout the period of incarceration." Fowlkes Direct Testimony ("Fowlkes Test.") at 2.[25] Dr. Fowlkes' opinion was based on evaluations of the medical care delivery system at *all* of the DCDC correctional facilities. *Cf.* Clark Test. at 8–10 (site visits limited); TR at 1095–97 (same). In February 1993, October 1994 and February 1996, he visited Minimum, Medium and the Youth Center, and, shortly before trial, Fowlkes toured all eight DCDC facilities.[26] *See* TR at 300.

**23.** This directive, entitled "Procedures for Obtaining Staff Interpreters for Limited English Proficient Inmates," was first implemented on December 15, 1994. *See* PE 198. The defendant updated it shortly before trial. PE 256.

**24.** Dr. Fowlkes is the Medical Director at the Bostick Correctional Institute in Milledgeville, Georgia, where he supervises physicians, dentists, physician's assistants and nursing staff. Prior to this position, he had been the Medical Director for the jails on Rikers Island in New York City where he supervised the delivery of health care services to approximately 16,000 inmates. Fowlkes Test. at 2–4 & attachment 1; TR at 298–99.

**25.** The direct testimony offered by the defendant's expert, Dr. John Clark, was less persuasive, in part because his site visits were limited to only a few of the DCDC facilities. *See* Clark Test. at 8–10; TR at 1095–97. Dr. Clark also did not identify those persons, inmates and staff, to the same degree of precision as Dr. Oquendo or Dr. Fowlkes. Additionally, while Dr. Clark testified regarding certain measures taken by DCDC as late as April of 1996, his testimony did not establish a basis of personal knowledge for the measures that were purportedly implemented after his site visits in early 1995. *Compare* Clark's Test. at 8–11 (site visits conducted January 31, 1995 through February 2, 1995, and limited to Central, Occoquan, DC Jail and CTF) *with id.* at 13–14 (describing training conducted or system-

wide measures first implemented by DCDC during April, May and June of 1996). The Court notes that the plaintiffs elected not to cross-examine Dr. Clark. Therefore only Dr. Clark's direct testimony, submitted in writing pursuant to the parties' agreement, was available for the Court's consideration.

**26.** Dr. Fowlkes testified that his May 1996 site visit was conducted partly "[i]n response to the District's claim that it had corrected the problems." Fowlkes Test. at 5. During the May 1996 tour, in addition to reviewing numerous records including medical records, policies and procedures, he spoke with the following officials:

1. Emmeth Daniels, M.D., Charge Medical Officer, Maximum;
2. Hilary Foltz, Charge Nurse, Maximum;
3. Mr. Kinnard, Physician's Assistant, Maximum;
4. Mr. Stevens, Physician's Assistant, Maximum;
5. Noel Tait, D.D.S., Chief Dental Officer, Maximum;
6. Reyna Vasquez, Correctional Officer, Bilingual Coordinator, Maximum;
7. Lucia Colon, Correctional Officer, Bilingual Coordinator, Central;
8. Ms. Witherspoon, Chief Nurse, Central;
9. Alwin Harding, M.D., Chief Medical Officer, Central;
10. Bruce Halliburton, Health Educator, Central;

The evidence at trial clearly described the language barriers faced by LEP · Hispanic inmates who seek medical care in the DCDC correctional institution health care facilities. Dr. Fowlkes testified persuasively and other evidence substantiated that

> There are inadequate numbers of Spanish speaking staff, and those who do speak Spanish are not deployed to insure that there is bilingual staff coverage at critical sites. As a result, prisoners who cannot speak English cannot obtain care because they cannot communicate with a provider. *See, e.g.,* Fowlkes Test. at 9; TR at 300–01 (cross-examination of Dr. Fowlkes); PE 256 (based on DCDC's April 1996 staff roster, only two medical staff members who provide direct care are bilingual); TR at 138–39 (Nunez testimony); TR at 167–68 (Sandoval testimony).

> Although protocols for providing translators for medical encounters have been introduced, they have not been effectively implemented. The majority of the medical staff were unaware of the protocols. *See, e.g.,* Fowlkes Test. at 9 & 16–17; TR at 304 & 311–12 (describing medical staff's failure to follow 1994 policy on providing interpreters during medical encounters) (redirect examination of Dr. Fowlkes); *id.* at 309–10 (describing medi-

cal staff's lack of awareness regarding identity of bilingual coordinators); Hall Dep. TR at 31 (unaware of protocol but some awareness of a list of Spanish-speaking personnel).

> The confidentiality of Spanish speaking inmates is routinely violated by requiring other inmates or correctional staff to interpret medical encounters, and because medical staff are not sufficiently sensitive to the issue of confidentiality. *See, e.g.,* Fowlkes Test. at 9 & 14–16; TR at 303–04 (use of correctional officers and other inmates as translators is common, but improper, except for emergencies; not only are patients' right to confidentiality needlessly breached but such patients often suppress sensitive information regarding diseases like tuberculosis, and HIV and other sexually transmitted diseases); Miller Test at 29 n. 41 (same); Artola Dep. TR at 63–66; Gaviria Dep. TR at 29; Lugo Dep. TR at 51; Vazquez Dep. TR at 86–87 (Nov. 21, 1994).

> There is a chronic and pervasive misperception on the part of medical staff that inmates who barely speak English are capable of negotiating medical encounters in English. *See, e.g.,* Fowlkes Test. at 9; TR at 305–07 (testimony of Dr.

11. Joan Brindisi, Physician's Assistant, Youth Center;

12. Ms. Roberts, Nurse, Youth Center;

13. Dr. Paulos Kidane, Chief Medical Officer, Youth Center;

14. Dr. Desta, M.D., Youth Center;

15. Dr. Brown, D.D.S., Dentist, Youth Center;

16. Dr. Johnson, D.D.S., Youth Center;

17. Herman Branson, M.D., Chief Medical Officer, Minimum;

18. Dr. Fernandes, M.D., Minimum;

19. Ms. Calvin, Charge Nurse, Minimum;

20. Michelle Trotman, M.D., Occoquan;

21. Nader Marzban, M.D., Chief Medical Officer, Occoquan;

22. Dr. Tabrizi, M.D., Occoquan;

23. Patrice Pagan, Chief Nurse, Occoquan;

24. Tony Hinkson, Physician's Assistant, Occoquan;

25. Kathy Rayford, Physician's Assistant, Occoquan;

26. Kevin Sorum, Physician's Assistant, Occoquan;

27. Dr. Collins, D.D.S., Occoquan;

28. Veronica Inadagbo, Pharmacist, Occoquan;

29. Ms. Nmezi, Pharmacist, Occoquan;

30. Mr. Sumbush Kori, Pharmacist, Occoquan;

31. Dr. Cyrus Abedi, M.D., Chief Medical Officer, Medium;

32. Ms. Dhabe, Chief Nurse, Medium;

33. John Lynch, Deputy Warden for Programs, Medium;

34. Sonia Campbell, Medical Records Technician, Occoquan;

35. Eliza Taylor, M.D., Chief Medical Officer, CT, and Acting Medical Director for DCDC;

36. Ms. Gibson, Chief Nurse, CTF;

37. Dr. Miranda, M.D., CTF;

38. Marydot Thomas, Prenatal Nurse, CTF;

39. Mr. Carson, Pharmacist, CTF;

40. Mr. Coving, HIV Health Educator, CTF;

41. John May, M.D. DC Jail;

42. Kerri Gerald, Chief Nurse, DC Jail;

43. Vali Zabiheian, Physician's Assistant, DC Jail; and

44. Mike Dubose, Health Educator, DC Jail. Fowlkes Test. at 5–7.

Dr. Fowlkes also interviewed seventeen prisoners and reviewed a number of depositions and other documents. *See id.* at 8–9.

Fowlkes); TR at 647–48 (testimony of Dr. Oquendo).

**Hispanic inmates are not provided with an orientation to the correctional medical system at any of the DCDC facilities, and they are not informed adequately as to how they access the health care system.** *See, e.g.,* Fowlkes Test. at 9.

**The medical staff fails to coordinate the activity of Hispanic inmates seeking medical treatment, particularly specialty clinics to insure that translators are available when the patient presents for treatment.** *See, e.g.,* Fowlkes Test. at 9; TR at 321 (testimony of Dr. Fowlkes).

**Prisoners who are prescribed medication do not receive instructions regarding the administration of that medication or about the potential side effects in Spanish.** *See, e.g.,* Fowlkes Test. at 9; TR at 108 (Lazo testimony); TR at 123 (Bonilla testimony); Direct Testimony of Dr. Oquendo ("Oquendo Test.") at 26–27; TR at 645 (Oquendo testimony).

For medical care to be adequate, a doctor and a patient must be able to understand each other. *See* Deposition of Dr. William Henry Hall, Assistant Director for Health Services, Hall Dep. TR at 21 (Feb. 16, 1995)(defendant's Rule 30(b)(6) witness); Fowlkes Test. at 10; TR at 294–95 (cross-examination of Dr. Fowlkes).[27] A patient's inability to communicate with his or her doctor makes it almost impossible for a doctor to diagnose illnesses accurately or timely.

Fowlkes Test. at 10. Moreover, the adequate provision of health care services requires that a patient be able to understand how his or her medical problems must be treated. *Id.*

Dr. Hall, the defendant's Assistant Director for Health Services and designated Rule 30(b)(6) witness at the deposition of February 16, 1995, stated that effective treatment requires a full understanding of the patient's complaint. *See* Hall Dep. TR at 21. According to Dr. Hall, it would not be sufficient for a doctor to diagnose an illness based upon a patient pointing to his stomach or to his tooth, and then saying "ouch" or moaning.[28] *Id.* Despite these concessions by the defendant, the persuasive evidence at trial made clear that the delivery of medical services to LEP Hispanics within the DCDC facilities was often being provided on such a basis. *E.g.,* Fowlkes Test. at 11 (describing LEP Hispanic inmate who used hand signals to communicate regarding a foot problem); Fowlkes Test. at 19 (describing an M.D. at Occoquan who said she could adequately treat Spanish-speaking inmates by having them point to the affected body part and say "dolor," meaning pain in Spanish); TR at 120 (after being stabbed, inmate testified he could only communicate with doctors by sign language); TR at 123–24 (medicine prescribed even though communication was based generally on sign language); TR at 165 (communication regarding foot injury based on sign language); Artola Dep. TR at 69 (health care provider communicated

---

**27.** *Dr. Fowlkes explained:*

One of the fundamental principles around providing clinical services is to be able to communicate with your patient. Standard documentation is what we call the SOAP format, S–O–A–P, the "S" stands for the subjective and that tells you what the person is coming to you for. Following that is the objective. That is when you actually do the physical and many times when you're doing the physical you need to elicit information from your patient. So, these are two areas where it's crucial that you're capable of communicating.

The "A" is for the assessment and that gives you your diagnosis. And if you don't have the appropriate data from the subjective and the objective, this is the area where communication is crucial, then the chances of you coming up with the appropriate diagnosis is small, the likelihood is small and without the appropriate

diagnosis, the treatment plan ["P"] cannot be appropriate.

So, in the case of a person who has cardiac risk factors, who's coming in complaining of chest pain, without the appropriate level of communication, one could misinterpret coronary artery disease for pleurisy. There's a big difference. If you did not pick up coronary artery disease, potentially this person could go out and have a fatal heart attack.

So, this is the situation and I think also, when you're working in a health service, you're interested in providing quality service and part of that is an ongoing evaluation of your systems.

TR at 294–95.

**28.** Similarly, effective communication is necessary when a doctor conducts an eye examination or prescribes medication for a patient.

through sign language); Bonilla Dep. TR at 60 (LEP Hispanic inmate communicated by pointing to his tooth). Within the Department of Corrections, poor communication has led to inadequate treatment for LEP Hispanic inmates, deficiencies of which correctional officials knew or should have known.

The defendant's medical staff, even at high levels, displayed a marked insensitivity toward the need for interpreters during medical encounters. Dr. Fowlkes opined "that a significant majority of the medical staff seemed to attribute an ability to function minimally in English as equivalent to being able to effectively communicate in a medical setting." Fowlkes Test. at 18–19. Dr. Fowlkes opinion was based, in part, on one instance in which the Chief Medical Officer at Central told Dr. Fowlkes that Hispanic inmates could "understand enough" English if, for example, they could understand "positivo" after undergoing a test for HIV. Id. at 19. While the evidence at trial established, and the defendant conceded, that 80% of the Hispanic inmates in its facilities were limited-English proficient, its medical staff for whatever reason believed the level of proficiency to be much higher. According to the Chief Medical Officer at the Youth Center, a specific Hispanic patient "can speak English whenever he wants." Fowlkes Test. at 18. Dr. Fowlkes' interview of that patient revealed that the patient was not capable of conducting an effective medical encounter. Id. Similarly, a Physician's Assistant at Maximum articulated his belief that Hispanic inmates are fluent in English because in the District of Columbia, Hispanics speak both English and Spanish. Id. at 19. Moreover, the medical staff failed to acknowledge the significance of language limitations in health encounters. Id. at 18–19. The medical staff's

relaxed attitude translates to the denial of effective medical care for LEP Hispanic inmates in the DCDC system.[29]

While the defendant first promulgated procedures for obtaining staff interpreters for LEP inmates in 1994, these procedures have not been effectively implemented. A significant proportion of the DCDC medical staff are unaware of these procedures.[30] Fowlkes Test. at 16. Other staff members, for whatever reason, choose to ignore the procedures. As a consequence, when it comes to finding interpreters for medical encounters, inmates are generally forced to fend for themselves. Because the defendant fails to provide interpreters, some LEP Hispanic inmates bring other inmates (whose bilingual abilities vary widely) to interpret at medical encounters. Sometimes, medical staff ask correctional officers (whose bilingual abilities also vary widely) to interpret on a non-emergency basis. Other times, a medical staff member will tell the inmate to bring his or her own interpreter. Despite the defendant's oft-repeated claim that bilingual staff are always available somewhere in the DCDC system, some inmates have never seen a bilingual staff member at medical encounters. While the defendant's procedures allow an inmate to execute a waiver of the right to an interpreter, the defendant has amended the waiver form by deleting the provision that advised an inmate that he or she is also waiving their right to medical confidentiality.[31]

The evidence at trial established that the actual policy and practice regarding interpreters at medical encounters was not the same as the "policy" memorialized in the defendant's written instruction. The written policy, was seldom, if ever, followed. When interpreters are provided for medical encoun-

---

29. The defendant's rebuttal arguments appear to be focused on Dr. Fowlkes' inability to testify that anyone had died as a result of medical (mal)treatment at DCDC, see TR at 294, or the fact that LEP Hispanic inmate Martha Gaviria's baby survived delivery, see Clark Test. at 23. The fact that the plaintiffs have not demonstrated that a catastrophe has yet occurred is not persuasive evidence for the defendant's case.

30. Every medical staff member whom Dr. Fowlkes interviewed indicated that the AT & T Language Line had never been used for a medi-

cal encounter. Fowlkes Test. at 16. Nor could any tell him how to obtain the access code that is necessary for its use. Id. Some had heard of the service, but thought that special telephones had to be installed before it could be used. Those staff members who were aware of it were generally provided the information shortly before trial.

Id.

31. At trial, one inmate demonstrated uncertainty about the meaning of the word "waiver." TR at 151 (Nunez testimony).

ters, it is done on a haphazard basis, if at all. As a result, inmates are too frequently denied timely and effective medical treatment because there are no interpreters available. Sometimes, medical problems are described and medical treatment is prescribed through hand signals—an ineffective and dangerous way to diagnose a disease or treat a patient. Often, an inmate's communication with his or her doctor occurs only by using another inmate or a correctional officer as a lingual conduit, offering interpretation of questionable quality and needlessly abridging the LEP Hispanic inmate's medical confidentiality.

The LEP Hispanic inmate's inability to access the medical care system was perhaps most striking with respect to HIV testing and counseling. HIV testing and education are particularly important in prisons where the rate of HIV infection is six times higher than in the community. TR at 312. However, despite this fact, Dr. Fowlkes opined that LEP Hispanics are not being provided with information on how to request HIV tests. Fowlkes Test. at 23–24; TR at 313–15. Those that do obtain tests are forced to compromise their confidentiality to do so. Fowlkes Test. at 23–24; TR at 313–15.

Moreover, the HIV counseling that was being provided was inadequate. Fowlkes Test. at 24. Dr. Fowlkes' opinions were based largely upon interviews with the defendant's own medical staff. For example, neither of the two health educators responsible for HIV education spoke Spanish. In one instance, where one of these health educators gave an HIV test to an LEP Hispanic inmate, the inmate's chart reflected that the patient "appeared to understand" what he was told during the counseling session. Fowlkes Test. at 24. In another instance,

the doctor who ran the chronic disease clinic at the Youth Center told Dr. Fowlkes that although she conducts HIV counseling, she did not know what she would do if a Spanish-speaking inmate requested an HIV test. *Id.* at 25. Not only does this doctor in a key medical staff position lack knowledge of the defendant's purported procedure for obtaining interpreter services, this statement is a persuasive indicator that LEP Hispanics are not accessing the health care system for HIV testing. Dr. Fowlkes opined that further evidence of LEP Hispanic inmates' ability to access the system is the statement to him by the health care staff member at Maximum, who conducts HIV tests and counseling, that she has never administered an HIV test to a Hispanic inmate. Failure to treat HIV proactively, particularly in a prison population, threatens not only the infected person's health, but endangers those to whom the infected inmate will be exposed.

In the area of mental health care, the plaintiffs offered the testimony of Dr. Sonia I. Oquendo, M.D., who concluded that the provision of psychological and psychiatric services to Hispanic prisoners in the DCDC institutions was "grossly inadequate and dangerous."[32] Dr. Oquendo based her opinion on tours conducted of DCDC facilities in 1993, 1995 and 1996 (immediately prior to trial), document and deposition review, as well as interviews with prisoners, medical staff and mental health staff. Oquendo Test. at 3; TR at 639 (redirect testimony of Dr. Oquendo). She stated that she conducted her site visit in May 1996 to update her opinion and to learn whether the problems that previously existed had been cured. After touring the District's correctional system, interviewing critical staff members[33] and fourteen prisoners, she concluded that

32. Oquendo Test. at 1. Dr. Oquendo is the Director of Mental Health Services, Montefiore Medical Center, Rikers Island, New York. In that capacity, she oversees the delivery of mental health services to the approximately 15,000 prisoners confined in the Rikers Island system. *Id.* She has practiced psychiatry in the correctional setting since 1987 and presently supervises a staff of 179, who conduct approximately 200,000 mental health examinations annually. *Id.*

As to the adequacy of the DCDC's mental health care delivery system, the defendant offered Dr. Clark's expert testimony. *See* Clark

Test. at 24–25. However, because Dr. Clark's speciality was in obstetrics and general prison health care administration, the Court did not accept the expert testimony proffered on mental health issues because it was beyond the scope of his expert qualifications. *See* TR at 1095–97.

33. Dr. Oquendo interviewed the following correctional officials:

1. Dr. Henry Edwards, M.D., Chief Psychiatrist;

2. Dr. Peter Roemer, M.D., Psychiatrist, Maximum;

the situation had not improved. The problems that I had seen during my previous tour and review of documents continue to exist. In one critical way, the situation had in fact worsened. Several policy changes had been made, but not implemented, thus giving the illusion that the problems had been resolved when in fact they had not. Thus, for example, although there is a formal policy to use translators, they are not used, the testing of prisoners for English language ability is grossly inadequate, and treatment other than medication, as a practical matter is unavailable. These cosmetic changes concealed real problems and interfere with real solutions. I was also greatly disturbed by the apparent indifference by many of the mental health staff to the needs of this population.

Oquendo Test. at 4; *see also* TR at 640 (no meaningful changes implemented).

The evidence at trial, including Dr. Oquendo's expert testimony, established that the defendant has failed to provide adequate mental health care in the following areas:

• A failure to identify Hispanic prisoners in need of mental health services;

• A failure to make necessary and appropriate treatment available;

• A failure to monitor or ensure continuity of care for those Hispanic prisoners who do receive treatment;

• A failure to obtain informed consent prior to the administration of psychiatric medications; and

• The violation of medical confidentiality through the improper use of prisoners and correctional officers to translate mental health encounters.

The Court finds, based in large measure upon the testimony of Dr. Fowlkes and Dr. Oquendo as well as statements by inmates and the defendant's staff, that there is a "great gulf between official policy and actual practice." Oquendo Test. at 8. Dr. Oquendo testified that while she reviewed documents that described a number of programs, "as [she] made her site visit, it became clear that these programs existed on paper only." *Id.* For example, the psychologist whom the defendant designated as the Hispanic Coordinator for mental health services since the beginning of 1996, stated to Dr. Oquendo on May 13, 1996, that he had never been advised of his responsibilities, duties, role or authority. *Id.* Dr. Oquendo cited other examples of initiatives that she was told existed, but in fact did not, such as "the failure to utilize forms that have been translated into Spanish, the failure to make therapies other th[an] medication available [to] non-english speakers, the failure to utilize the ATT language line, and the failure to adequately test Hispanic prisoners for language ability." *Id.* at 8–9.

3. Dr. Spevak, M.D., Psychiatrist, Central;
4. Dr. James Word, Ph.D., Hispanic Coordinator, Mental Health Services;
5. Dr. William Davidson, M.D., Psychiatrist, CTF;
6. Dr. Eliza Taylor, M.D., Chief Medical Officer, CTF;
7. Dr. Ema Dackuel, M.D., Psychiatrist, DC Jail;
8. Dr. Anthony Rapone, Ph.D., Psychologist and Hispanic Coordinator, Minimum;
9. Dr. Jones, Chief Psychologist, Occoquan;
10. Dr. Gregory Brice, Psychologist, Youth Center;
11. Ms. Eleanor Heath, Chief Psychiatric Nurse;
12. Ms. Lorie Lewis, Administrative Staff, Mental Health Services;
13. Ms. Dawn Swistack, Psychiatric Nurse, Central;
14. Ms. Antoinette Ward, Psychiatric Nurse, Occoquan and Medium;
15. Ms. Gibbons, Chief Nurse, CTF;
16. Veronica Inadagbo, Pharmacist, Occoquan;
17. Ms. Nmezi, Pharmacist, Occoquan;
18. Officer Lewis Stevens, Hispanic Coordinator, Occoquan;
19. St. Maria Lapazaran, Religious Volunteer, Occoquan;
20. Ms. Gerald, Chief Nurse, DC Jail;
21. Dr. John May, M.D., Chief Medical Officer, DC Jail;
22. Ms. Amanda Small, Psychiatric Nurse, Youth Center;
23. Ms. Jackson, Chief Psychiatric Nurse, DC Jail;
24. Officer Castillo, Hispanic Coordinator, DC Jail;
25. Ms. Faye Ashley, Psychiatric Nurse, DC Jail.

Oquendo Test. at 4–5.

The evidence at trial painted a picture of inadequate mental health services provided to LEP Hispanic inmates. For example, one inmate who had been sexually assaulted in prison was not receiving proper mental health care. Another inmate for whom the institution's medical staff had prescribed medication was transferred to another facility, but was not receiving treatment at that receiving facility. Dr. Oquendo based her expert opinion, in part, on her encounters during her tour with fourteen different Hispanic inmates suffering from mental health problems. Oquendo Test. at 14.[34] Many of these problems were exacerbated by the isolation that LEP Hispanic inmates experience due in part to the language barriers they face in the DCDC correctional institutions. *Id.* (relying in part on a conversation with Dr. Word, DCDC's Hispanic Coordinator for mental health services).

As with medical care in general, LEP Hispanic inmates are not adequately screened by bilingual medical staff upon entry into the DCDC system. LEP Hispanic inmate Nunez testified at trial that he received a diagnostic evaluation in English, even though he only spoke limited slang-English at the time. TR at 145–46. Similarly, one LEP Hispanic inmate testified that when he received his diagnostic screening, he spoke no English. TR at 160. The "language assessment test," which Laura Colon described as a modification of the widely accepted Brigance test,[35] does not adequately evaluate whether a prisoner can communicate in English sufficiently to participate meaningfully in a medical or a mental health encounter. Oquendo Test. at 10. Dr. Oquendo opined that the "system for prisoners to access mental health care was casual and relies heavily on referrals from correctional officers, case managers and medical staff." *Id.* at 22.[36] In part due to inadequate screening, LEP Hispanics, are not receiving adequate mental health care.[37]

LEP Hispanic inmates who do access the system receive mental health care that is deficient, because effective treatment can only be provided by a bilingual mental health care provider. Oquendo Test., *passim.* Due to the significance of linguistic and cultural nuances in psychiatric diagnoses, the translation of mental health encounters, even through a qualified interpreter, is inadequate. Oquendo Test. at 18. The defendant, however, has only two bilingual clinicians to provide mental health services, and the common practice is to use correctional officers, other inmates or staff to serve as interpret-

**34.** Dr. Oquendo did not interview all of the approximately 150 LEP Hispanic inmates. However, of those that she interviewed, she identified fourteen (or ten percent of the population) as requiring mental health care. The number of those who require treatment is likely far greater.

**35.** It is more accurately described as a condensed version. The results of the LAT test, which was designed by Ms. Colon and which was administered by bilingual coordinators shortly before trial, *see* PE 246, reflected that substantially more than twenty percent of the Hispanic inmates were English-proficient. *See* TR at 995; PE 252, 253, 254 & 255. The defendant's repeated concession that 80 percent of the Hispanic population is limited-English proficient casts serious doubt on its new LAT test. Based upon these results and the plaintiffs' experts' testimony, the Court finds the test to be inadequate to determine the language proficiency level of inmates.

**36.** Dr. Oquendo described an incident reported to her by Dr. Rapone and Officer Stevens in which an LEP Hispanic inmate was attacked by three other prisoners during the night in a restroom at Occoquan. Oquendo Test. at 22–23. Although the Hispanic inmate denied being raped, "there were sexual overtones to his description of the assault." *Id.* at 23. Later, according to Dr. Rapone and Officer Stevens, the Hispanic inmate was sexually assaulted when a correctional officer allowed one of the assailants into the Hispanic inmate's cell for four hours. *Id.* at 23 & nn. 10–11. Dr. Oquendo stated in her direct testimony that when she met with this prisoner, he was "seriously depressed, experiencing auditory hallucinations and having suicidal ideation." *Id.* at 23. While she opined that "this required immediate intervention, evaluation for medication, and supportive therapy," *id.*, he was receiving no treatment. *Id.* at 24.

**37.** That is not to say that no screening occurs when inmates are transferred. Although the inmate's English-language proficiency was not identified on the chart, Dr. Oquendo reviewed one medical record for a Hispanic inmate at the Youth Center who had a documented history of paranoia. *Id.* at 28. She stated that when this inmate was transferred from CTF to one of the Lorton facilities, his condition was identified by medical staff *Id.* at 29. Screening during transfers, like that during intake, is best described as sporadic and haphazard.

ers for mental health care encounters.[38] *See e.g.,* TR at 57–59 (Sister Maria testifying that DCDC psychologists asked her to translate mental health encounters); TR at 78–79 (same; request made 2–3 months before trial). TR at 211–14 (inmate used to translate); Oquendo Test. at 21 (use of maintenance worker). While the quality of the translation varies widely in these circumstances, the effectiveness of any diagnosis or treatment is compromised and the LEP Hispanic inmate is forced to surrender his or her privacy (to the extent he or she even decides to speak freely through the ad hoc interpreter). Oquendo Test. at 18–19.

Even more so than with physical medical practices, verbal encounters with mental health patients are necessary to diagnose mental health problems or prescribe medication. However, the evidence at trial established that few, if any, LEP Hispanic inmates in DCDC correctional institutions engage in meaningful verbal encounters with psychologists or psychiatrists in the DCDC mental health care system. Medication has been prescribed without a full understanding of the nature of the underlying problem, and

inmates do not understand the treatment plan or the potential side effects of the medication prescribed.[39] *See* Oquendo Test. at 29–30. Information regarding medicine is printed in English only, and Dr. Oquendo stated that DCDC pharmacy staff at Occoquan "were unaware of any program to ensure that information regarding prescription medications was translated for non-English speaking prisoners." *Id.*[40] While an informed consent form has been used by the defendant at least once,[41] Dr. Oquendo opined that in that instance, it was used improperly because the LEP Hispanic inmate who signed the form (which is written in English) did not understand English and was not counseled regarding the form or his medication in Spanish. *Id.* at 30. According to Laura Colon, the LEP Coordinator, DCDC policy requires that interpreters be provided to ensure Spanish-speaking inmates know how to take their medication and understand the side effects. However, even Laura Colon, the DCDC LEP Program coordinator, did not know whether interpreters were assigned to perform that function or

**38.** Dr. Oquendo cited a statement by Dr. Edwards reporting one instance in which a bilingual maintenance worker was used to interpret a mental health encounter with a patient believed to be acutely psychotic. Oquendo Test. at 21–22.

**39.** Dr. Oquendo described one instance in which an LEP Hispanic inmate reported difficulty sleeping after he was attacked. He was prescribed Sinequan, a tricyclic antidepressant with potentially serious side effects, "including sedation and changes in the electrocardiogram." Oquendo Test. at 26; *see also id.* at n. 12 (opining that the wrong dosage was prescribed in that while it was sufficient to alleviate insomnia, it was insufficient to treat the underlying depression). Dr. Oquendo explained that the inmate experienced a lethargic reaction to the medicine and because of an inability "to communicate with the health care provider, he continued to receive the prescription but failed to take the medication." *Id.* at 26. Dr. Oquendo identified four significant problems: (1) the LEP Hispanic inmate could not understand the treatment modality or appreciate the potential side effects; (2) he was unable to report an adverse reaction to the medication; (3) he was deprived of the benefit of the medication; and (4) he was allowed to hoard a potentially dangerous medication that could be fatal in an overdose. *Id.* at 27.

In another example, Dr. Oquendo illustrated the importance of proper counseling in terms of

obtaining patient compliance. "This inmate, who reports a history of serious mental illness, was prescribed psychotropic medications. He took the medications for a period of time, but stopped taking them because he believed that he was being subjected to experiments by the medical staff" *Id.* at 30. Dr. Oquendo opined that if this inmate had been properly counseled by a bilingual provider, he likely would have continued the medication. "Without the medication he is experiencing auditory hallucinations, is suffering a great deal and is a suicide risk." *Id.* at 31.

**40.** Dr. Oquendo stated that the staff "speculated that a non-English speaking prisoner would have a guard or other prisoner translate the information on the package." Oquendo Test. at 30. She opined that "[t]his is inadequate for three reasons, first, the prisoner's privacy is breached, second, she or he may fail to get the package translated and thus be deprived of the information, and third, the information may be translated inaccurately or incompletely." *Id.* at 30.

**41.** On redirect, Dr. Oquendo stated that while she was told that informed consent forms had been translated into Spanish, she saw no evidence that such forms were being used. TR at 565–61 & 664. Nor did the defendant introduce into evidence at trial medical informed consent forms in Spanish—neither blank forms nor executed samples.

whether any forms were available in Spanish. TR at 948.

The *follow-up* mental health care provided to LEP Hispanic inmates, if any, is similarly deficient. Dr. Oquendo opined, and other evidence supported, that "[t]he mechanisms in the Department of Corrections to ensure uninterrupted treatment of non-english speaking Hispanic prisoners [are] haphazard at best." Oquendo Test. at 26. For example, inmates transferred between institutions are not always identified to the mental health care provider at the receiving institution.[42]

### B. Access to Educational and Vocational Programs.

The evidence at trial established that programs available for LEP Hispanic inmates were limited. The Department of Corrections presently offers 351 programs to inmates. PE 294. While every program is available to every inmate, only twenty-seven are conducted in Spanish or are specifically tailored for LEP Hispanic inmates.[43] However, this constitutes approximately seven percent of all of DCDC's programs, even though Hispanic prisoners comprise less than two percent of the prison population. PE 294.

·In 1992, Laura Colon identified a "desperate need for Spanish programs." PE 58 at 2. However, as of the date of trial, none of the six programs that she identified were being offered at seven of the eight institutions then being operated by DCDC. At Occoquan, the facility where most programs were offered, only three of the six programs are available (substance abuse, alcoholics anonymous and life skills). The plaintiffs' expert on correctional issues testified that "DCDC provides no Spanish-language programs to more than 75 percent of the Hispanics in custody." Miller Test. at 41.

DCDC has been aware of the lack of programs available to Spanish-speaking inmates since at least 1991. Nevertheless, over the past four years, the Department of Corrections has discontinued proportionately more Spanish-language programs than English-language programs. While half of the Spanish-language programs offered since 1992 have been discontinued, only 17% of the English-language programs have been cut.

·Similarly, while the LEP budget has not been cut, the scope of the program has been reduced. *See* TR at 600–01. The program was initially in place at four institutions, but today it operates only at two (Occoquan and Central). TR at 577–78. There are no plans to expand the program. TR at 578.

The lack of programs has had an adverse impact upon LEP Hispanic prisoners. In addition to being deprived of programs from which they would benefit generally, they do not have the same opportunities to earn the "good time" credits that are available for participating in certain programs, *see* PE 7, thereby potentially reducing the length of their sentences. *See id.* at ¶ 8(a)(1); TR at 1000 & 1063–69; Miller Test. at 43.[44] Only

---

**42.** Dr. Oquendo cited the case of an LEP Hispanic prisoner who "began to 'hear voices' following a blow to his head during an altercation with correctional staff" Oquendo Test. at 27. At Occoquan, he was seen by mental health staff and prescribed Thorazine, an antipsychotic medication. She stated that "[t]wo weeks prior to [her] interview, he was transferred to the Maximum Security Facility [where] he has not received medication, [or] seen a mental health provider." *Id.* The inmate stated that the "voices" have returned and were telling him to "hang-up" or commit suicide by hanging. *Id.* at 28.

**43.** Excluding religious programs, the breakdown is as follows:

| Facility | # programs in English | # programs in Spanish-language |
|---|---|---|
| Central | 29 | 1 |
| CTF | 38 | 1 |
| DC Jail | 9 | 1 |
| Maximum | 16 | 0 |
| Medium | 19 | 1 |
| Minimum | 17 | 0 |
| Occoquan | 19 | 7 |
| Youth Center | 24 | 0 |

PE 294 (While the ESL program is tailored for Spanish-speaking inmates, it is not provided in the Spanish language).

**44.** One consideration during a parole hearing is whether parole would be consistent with the *safety* of the public. *Inmates who are able to* obtain treatment and participate in programs enhance the likelihood that they will be granted parole. TR at 1079. Michael Green, Director of the Division of Parole Determination Services, D.C. Parole Board, testified that a lack of programming is not held against inmates when parole determinations are made, but there is no written policy to that effect. TR at 1077–78.

eight of the Spanish-speaking programs offered allow for the opportunity to earn good time credits.[45] TR at 911. Of these eight programs, four are the English as a Second Language or ESL program. TR at 911 & 934. The ESL program is comprised of four levels: preliteracy, beginner, intermediate and advanced. TR at 597. Only by completing the fourth (advanced) level and obtaining an eighth-grade reading level is an inmate entitled to good time credits. TR at 597, 615 & 934. No Spanish-speaking inmate has ever obtained an eighth-grade reading level; therefore no Spanish-speaking inmate has ever received good time credit from an ESL class. TR at 597–98, 934.

A number of Spanish-language programs in which LEP Hispanic inmates could have earned good time credits were discontinued by the Department of Corrections, and unlike the vocational programs available for English-speaking inmates, there are no Spanish-language vocational programs in which Spanish-speaking inmates can obtain good time credits. TR at 598; PE 7; PE 294.

## C. Failure to Provide Translators at Hearings.

The evidence at trial established that the Department of Corrections frequently conducts various hearings involving LEP Hispanic inmates without properly trained interpreters. It sometimes conducts hearings involving LEP Hispanic inmates without providing interpreters at all.

DCDC has long been on notice that LEP Hispanic inmates require interpretive assistance at disciplinary hearings. *See, e.g.*, Vernon Hawkins Dep. TR at 129–31 (Dec. 6, 1994) (acknowledging need for interpreters at parole and disciplinary hearings); PE 42 (Memo from Laura Colon to Vernon Hawkins, dated March 1992) ("When a hearing takes place, there are no bilingual staff to interpret. Other residents act as interpret-

ers."); PE 72 (Letter from Robert Hauhart, Supervising Attorney, DC Public Defenders Service to Margie Utley, Director, Department of Human Rights, dated Jan. 26, 1993, at 4) ("it is evident that non-English speaking residents, or residents who do not speak English well, need special assistance in order to receive fair hearings"); PE 125 (Memo from Laura Colon to William Plaut, Associate Director for Institutions, dated Feb. 3, 1994) ("There have been incidents when residents are being interviewed by the adjustment board with no interpreters."); TR at 950–51 (testimony of Laura Colon); PE 144 (Memo from Laura Colon to Al Washington, Training Coordinator at Occoquan, dated May 11, 1994) ("Residents are not to act as translators in cases of adjustment board, medical or any other official department business."); PE 145 (Memo from Laura Colon to Joyce M. Jones, Deputy Warden for Programs, dated May 31, 1994) ("Residents are serving as translators for case-managers, security, adjustment board and psychologist (sic)."); *id.* at 2 ("[R]esidents are receiving stiffer penalties because they cannot speak English. The officers are aware they do not understand the language. They are not afforded a bilingual officer."); Deposition of William Plant, Deputy Director of Operations, Dep. TR at 153–54 (Oct. 31, 1994) (acknowledging that LEP inmates may have appeared before adjustment boards without interpreters). The Department of Corrections subsequently issued a written policy purportedly requiring the provision of interpreters at Adjustment Board proceedings. *See* PE 198, DE 49 ("Procedures for Obtaining Staff Interpreters for Limited English Proficient Inmates," dated Dec. 15, 1994); PE 256, DE 81 ("Procedures for Obtaining Staff Interpreters for Limited English Proficient Inmates," dated Apr. 11, 1996); TR at 949 (testimony of Laura Colon).

The importance of objective, accurate translation services at these hearings is obvious. Adjustment board hearings, at

---

Moreover, the evidence at trial indicated that, in fact, LEP Hispanic inmates have been penalized for a lack of programming. *See* PE 145 at 3; PE 172; PE 184; TR at 980; Deposition of Laura Colon, TR at 106–07 (Nov. 30, 1994).

**45.** Of these programs, five are offered at Occoquan and one each at CTF, Central and Medium. Id. PE 294. There are no programs in the Spanish-language at DC Jail, Maximum, Minimum or the Youth Center that offer the potential to earn good time credits. TR at 931–32.

which alleged disciplinary violations are adjudicated, "become a permanent part of the inmate's record and have negative ramifications concerning custody status, program eligibility, parole consideration and institutional designation, in addition to the punishment meted out by the adjustment board." Miller Test. at 22. In order to defend themselves at adjustment board hearings, an LEP Hispanic, like any inmate, must be able to understand the nature of the charges against him as well as the hearing itself and the decision by the board. *Id.* At parole board hearings, the inmate is provided an opportunity to make a statement, which can be important to a parole determination. *See* TR at 1072 (testimony of Michael Green). At housing board hearings, at which decisions are made regarding where inmates are to be housed, it is important to obtain an inmate's statement, particularly where the inmate can explain why he feels that housing him in a specific dorm or institution would place him in danger. *See* Iraheta Dep. TR at 89.

Under the defendant's current written policy, absent a waiver, the Department of Corrections is required to provide an interpreter at classification, housing and adjustment board hearings. *See* PE 256, DE 81.[46] The defendant's actual practice, however, has not reflected its written policy, and this fact has been communicated up the chain of command. *See, e.g.,* TR at 388–94 (testimony of Iraheta); PE 216 (Memo from Vilma Iraheta to Warden John Henderson, Occoquan, dated Feb. 15, 1995) (describing continuing failure to provide interpreters for LEP Hispanic inmates at hearings and medical encounters).

Significantly, after the defendant issued its purported policy to require interpreters, Ms. Iraheta provided notice that staff were repeatedly failing to comply with that "policy":

> In summary, the implementation of the translation procedures for Limited English Proficient Inmates need[s] more than a memorandum and/or Department Order, so far the problems found are: inmates (who may not speak Spanish) are being used as translators, staff have made subjective and personal evaluations of the inmate['s] English proficiency and the staff have made comments regarding the inmate['s] criminal charges without bases (sic) and not related [to] the reasons why the inmate is seeking services.
>
> There are other issues concerning the staff providing translations that may be necessary to take into account for example the possibility of legal liability due [to the fact] that staff at the Department are not certified translators, some staff are not fluent either in Spanish or English, [and] as a result the translation may not be accurate.[47]
>
> As possible remedies I would suggest that staff be reminded to follow the established procedures for obtaining translation and to abstain[ ] from making their own evaluation of the English skills of the inmate, specially (sic) if the inmate insists that he need[s] a translator.

PE 216 (Memo from Vilma Iraheta, Case Manager, to John S. Henderson, Occoquan Warden, dated Feb. 15, 1995).

Despite this memorandum and other notice provided to the defendant, the problems described in Iraheta's memorandum of February 15, 1995, were ongoing as of the date of trial. TR at 389 (testimony of Iraheta).

Rosalyn Overstreet–Gonzalez, Esq., ("Overstreet–Gonzalez"), testified about the

---

46. There apparently is no requirement that the staff interpreter be trained or officially certified. Laura Colon, who testified that she is fluent in Spanish, but who is not a trained linguist or a certified translator, stated that she decides whether a person is sufficiently fluent to be placed on call as a DCDC bilingual staff member and used as an interpreter.

47. Laura Colon had also warned DCDC officials about the potential for legal liability in this regard:

> I specifically informed all uniform staff and supervisors to discontinue the practice of having residents serve as translators in the Adjustment Board, Mental Health and medical areas. Based on the residents' comments this practice has not stopped. The department can be liable if the residents decide to file a suit claiming that their right to privacy has been violated which is actively occurring.

PE 145 (Memo from Laura Colon to Joyce M. Jones, Deputy Warden at Modular, dated May 31, 1994).

defendant's actual practice regarding the provision of interpreters at hearings.[48] Overstreet–Gonzalez, an attorney with the Prisoners' Rights Program of the D.C. Public Defender Service, has represented LEP Hispanic inmates (among others) at DCDC hearings since September of 1995 (approximately nine months after the defendant first adopted its written "policy").[49] TR at 227. Overstreet–Gonzalez testified that she speaks Spanish and has represented inmates at Maximum, Central, Occoquan, Medium, the Youth Center, DC Jail and CTF. TR at 227–28. Despite DCDC's written policy, Overstreet–Gonzalez testified that LEP Hispanic inmates have been denied interpreters at adjustment board hearings. TR at 247–49 (Portillo); *id.* at 250–52 (Sequina); *id.* at 242–44 (Gomez); *id.* at 245–46 (Romero).

The provision of interpreters by DCDC was, in her experience, haphazard at best. TR at 237. For example, although Overstreet–Gonzalez conducted all of her business with one LEP Hispanic inmate in Spanish, the Chairperson of the Adjustment Board at Central, Sgt. Herbert, determined that the inmate spoke English and denied the request for an interpreter. TR at 249. The proceeding went forward, forcing her to serve as the interpreter. She testified similarly that when Lt. Lane, acting as Chairperson of the Adjustment Board at Occoquan, denies an LEP Hispanic inmate's request for an interpreter, the hearing often continues anyway. TR at 239.[50] On other occasions, DCDC officials asked her to interpret even though she was representing the LEP Hispanic inmate at the hearing. TR at 238–39. In her experience, LEP Hispanic inmates' requests for interpreters are handled similarly at housing board and classification hearings and with respect to the IGP process. TR at 253–59. Overstreet–Gonzalez's personal observations were consistent with the testimony of LEP Hispanic inmates, a bilingual Catholic chaplain who volunteers his services at Lorton and Ms. Iraheta. *See, e.g.,* TR at 99 & 103–04 (testimony of Lazo); TR at 212–17 (testimony of Chaplain Perez); TR at 369 & 379 (testimony of Iraheta).[51]

The failure to use disinterested, trained interpreters creates additional problems, since neither the LEP Hispanic inmate nor the board have any way of knowing whether the interpretation is accurate or has been colored by the view of the "interested" untrained interpreter. *See, e.g.,* TR at 104; TR at 1081–81; Ramos Dep. TR at 55–58; *id.* at 73–78. The use of correctional officers as interpreters for non-emergency purposes creates additional factual disputes, particularly where officer misconduct is alleged. *See, e.g.,* TR at 101–03 (inmate testified that one officer lied in connection with disciplinary report regarding a different officer's alleged assault on inmate). While being deposed by defendant's counsel, who was also counsel at the trial, Jose Ramos described a situation in which the Department of Corrections provided him with another inmate to act as an interpreter at a preparole classification hearing at Modular. Ramos Dep. TR at 55. At this hearing, the board accepted Ramos' representation that he spoke no English, but without seeking a knowing waiver, provided him with an inmate interpreter:

48. Overstreet-Gonzalez testified that the problems are not limited to the hearings, but language barriers interfere during all four stages of the adjustment board hearing process: (1) the investigatory stage, at which translators are provided only 5–10% of the time, TR at 231–32; (2) the presentation of charges, which is made in English, TR at 232; (3) the notice of hearing, also in English, TR at 235–36; and, (4) at the hearing itself

49. She estimated that 35 to 45 percent of her clients were LEP Hispanic. TR at 228.

50. There was evidence at trial that hearings are frequently delayed as a result of the unavailability of interpreters. While Mr. Green contended that the delays averaged approximately two weeks in duration, Ms. Overstreet–Gonzalez and Sister Maria contended that they often ranged between four to eight weeks. Consistent with the testimony of the latter, at trial, Laura Colon testified that the unavailability of an interpreter has resulted in delays of "several weeks or even months." TR at 981. The Court finds Green's testimony to be less credible on the issue of delay.

51. The Court accepted that the testimony provided by Ms. Iraheta was, in most instances, based on her knowledge or actions while acting as the defendant's agent in her assigned duties as a bilingual case manager and bilingual coordinator. TR at 377–78.

Q: (Maria Amato, Esq.) You said you were provided an interpreter?

A: (Ramos) Yes.

Q: Who was that?

A: It (sic) was an inmate called Santos.

Q: Did you select Santos to be your interpreter?

A: Not precisely. I will tell you the story how it went. They called me around 9:00 o'clock in the morning, and, they called and there was a group of people that were going to do the classification for me. They asked me if I spoke English, and then, often, I said I didn't know what was going on, and then they said, no.

Q: I'm sorry?

A: That is to say they asked me if I spoke English and, I told them, no, I didn't know anything, and, they had me sit down and wait five minutes, and I waited for five minutes, but actually they had not asked me to wait five minutes, and, then, I saw a Hispanic walk in, and, then, they started talking, and the Hispanic started to interpret what, supposedly they were saying, and then, he told me that they were classifying me to recommend me to parole, and I told him that I wanted to explain to them the situation, why I had been brought back from the halfway house, and then, he told me that was really not necessary, because, I was going to be leaving very soon, and that is when—what had happened, and that is what it is that happened, what we are talking about here.

Q: When the inmate said to you, did you tell the inmate that you wanted to tell the Board, anyway, what your position was about being returned from the Halfway House?

A: Yes.

Q: And, what did he do?

A: And, he said, it isn't necessary, because they have classified you already and, very soon, you will be leaving.

Q: Do you know if the D.C. Department of Corrections recommended you for parole? I am asking you if the Department of Corrections recommended parole?

A: According to the interpreter, he said, yes, that I was recommended for parole.

Q: What, ultimately happened, however? Do you know if you were recommended for parole in reality?

A: No.

Ramos Dep. TR at 56–58.

Similar problems arise at hearings due to the defendant's failure to provide documents translated into Spanish. Illustrative of the defendant's relaxed attitude is its failure to provide Spanish versions of documents used in connection with parole hearings. On November 17, 1992, Ms. Colon wrote to Vernon Hawkins, DCDC Chief of Special Needs, requesting that certain Parole Board documents that *she had already translated* into Spanish be provided to LEP Hispanic inmates. *See* PE 299; TR at 982. Two years later, however, Ms. Colon had no knowledge as to whether those documents were being distributed to LEP Hispanic inmates. TR at 982. And, at the time of trial, almost four years later, the documents that she had translated in 1992 were still not being provided to LEP Hispanic inmates. TR at 982–83.

While the defendant's policy requires the execution of a waiver before an inmate may serve as interpreter, *see* TR at 949; PE 198; PE 256, the Court was offered no copies of executed waivers.[52] Nor did the defendant's principal witness, Laura Colon, who was responsible for collecting documents relevant to this case, identify the existence of any valid executed waivers at the time of trial. TR at 955.[53] While the evidence suggested that a waiver form has been used at least once, the circumstances of its execution indi-

---

**52.** The waiver forms, included as attachment III to the December 1994 version of the defendant's policy, *see* PE 198, were amended in later versions by eliminating the sentence providing notice that inmates were waiving any right to confidentiality. *See* TR at 921; PE 256.

**53.** Of the ten boxes of documents that she collected and produced to the plaintiffs, Colon testified that she was not aware of any executed waiver forms contained therein. TR at 955. In response to a question from plaintiffs' counsel on cross-examination, she was unable to estimate the number of waiver forms that had been signed since December of 1994. TR at 954.

cate that the waiver was invalid.[54] At trial, neither Colon nor any other witness was able to say that DCDC's procedures for requesting interpreters were being followed. TR at 919–20.

While the defendant's compliance with its own written policy to provide interpreters at adjustment board and housing board hearings was, at best, haphazard and ad hoc, the evidence also indicated that there was no procedure in place to advise parole boards of the need for an interpreter. Miller Test. at 26. While the bilingual case manager at Occoquan, Ms. Iraheta, whose case load included the LEP Hispanic inmates at Occoquan, testified that she did not know of any bilingual members on the parole board, see Iraheta Dep. TR at 125, Michael Green, testifying for the defendant, contended that the board's practice for at least the past three years was to schedule such hearings before a board that had a bilingual board member. TR at 1051.

The plaintiffs' correctional expert testified to the inadequacy of interpretation services provided to LEP Hispanic inmates at hearings. Even in those instances when the procedures are followed, he noted that "[t]he procedures and criteria for identifying those who need translation services are quite unclear." Miller Test. at 23. He explained that each institution uses different procedures in determining who will receive translation services. Mr. Miller's direct testimony provided:

> For example, Lieutenant Lowe at Medium has been known to tell inmates claiming to need a translator, "I know you speak English, so we're going ahead."[55] Sergeant Francis Peach, the Outgoing Chair of the CTF Adjustment Board commented that if an inmate has been to court at all, he would understand the adjustment board process, since it is no different from court—implying that no translator would

be needed.[56] Another hearing officer, in charge of disciplinary hearings at Central, commented that "if I can't understand him [i.e., the inmate], I'll get a translator." This ignores the real issue: whether the *inmate* is able to understand the hearings.

Miller Test. at 23 & nn. 31–32 (emphasis in original).

Miller's expert opinion was consistent with other evidence at trial: the changes that DCDC claimed to have implemented immediately prior to trial, if implemented at all, were inadequate to correct the long-standing practices and procedural deficiencies. The claimed practice of marking an inmate's English proficiency on his file, if being done at all, is being done sporadically. Miller Test. at 24 & n. 33. And, to the extent, it is being accomplished, it is based on a test that is overly simplistic, revealing little about an inmate's actual language proficiency. *Id.* at 24. Moreover, the "new" procedures fail to address the three stages leading up to the hearing. Miller Test. at 24–25.

Contrary to the defendant's written "policy," the evidence at trial clearly established that the actual practice within DCDC correctional institutions often subjects LEP Hispanic inmates to Kafkaesque hearings—hearings where adjudications are made and their futures are affected by officials speaking a language that they seldom understand regarding allegations that are too infrequently explained to them in words that they understand.

### D. Free exercise of religion and availability of Spanish-language religious programs.

The Department of Corrections has long recognized that religious programs for LEP Hispanic inmates were inadequate. PE 25 at 2 (Memo of James Bragg, Administrator at

---

**54.** On June 6, 1994, LEP Hispanic inmate Jose Ramos advised the Warden at Modular that he was told to sign a white paper without being told what it was. PE 150. At his hearing, DCDC officials arranged for an inmate to provide interpreter services. *See Ramos* Dep. TR at 56–58, discussed *supra*. Later, as he explained in his letter to Warden Lattimore, he learned that the white paper was a waiver. PE 150. Execution

of an English-language waiver form by a person who can neither read English nor understand what he is signing is not valid.

**55.** Citing to an interview with Gonzalez–Overstreet of May 15, 1996.

**56.** Citing to an interview with Sgt. Peach of May 15, 1996.

Central, to William Plant, Associate Director for Institutions, dated July 31, 1991) (noting the need to enhance religious programs for Hispanic inmates); PE 23, 1991 DCDC Task Force Report at 5 (Identifying a major concern to be the "[a]bility of the limited-English speaking inmate[s] to have their spiritual needs addres[sed]"). At trial, Otto Perez, a bilingual Catholic assistant Chaplain who provides full-time volunteer religious services as a lay minister at the Lorton facilities, testified that Hispanic inmates have a unique need for religious services based on their backgrounds and the isolation caused by language barriers in prison. TR at 192.

Although the Department of Corrections has recognized the limited religious programs available to LEP Hispanics since at least 1991, at the time of trial, no Catholic religious services in the Spanish-language were offered at Minimum, Maximum, Medium, CTF, DC Jail or the Youth Center. TR at 100, 199–200; PE 294. At Central, DCDC offers LEP Hispanic inmates a weekly Catholic service which, except for the Eucharist, is in Spanish. TR at 193. Also offered at Central are a Bible study and a Christmas service. TR at 197; PE 294. The only Mass that is conducted entirely in Spanish is at Occoquan. TR at 198. Chaplain Perez also testified that there is a need for non-Catholic services in Spanish. TR at 204.

Although the Catholic religious services provided at Occoquan are funded by the Archdiocese of Washington at no cost to the Department of Corrections, Chaplain Perez testified that the defendant has not been cooperative. TR at 208. For example, he testified that DCDC has been slow to process paperwork and slow to establish times and locations for services. TR at 208–09. Chaplain Perez also contended that the defendant has not always notified, or assisted him in notifying, inmates about religious services. TR at 209–10. On occasion, he contended that the defendant's staff would not provide passes to inmates to attend religious programs. TR at 210–11. Despite bringing these problems to the attention of the administration, he stated that the problems have not been resolved. TR at 217.[57]

## E. Racially Motivated Violence and Harassment.

The evidence at trial painted a clear picture of prison violence. However, the plaintiffs did not carry their burden to establish that a significant portion of that violence was based on racial animus.[58] The evidence also reflected instances of inappropriate, and perhaps even racially discriminatory, conduct by correctional officers. Yet, on the whole, the evidence indicated that the defendant investigated incidents of which it was aware and, in most instances, treated seriously the complaints of and regarding Hispanic inmates.[59] In sum, the plaintiffs have established only the recognized fact that prisons are violent places in which violent inmates of various races are incarcerated.

The undisputed evidence presented at trial established that the District of Columbia has, in fact, been aware of complaints of harassment and assault. *See, e.g.,* PE 42; PE 51. Laura Colon raised the Hispanic inmates' concerns to, among others, Bernard Braxton, Administrator at Occoquan. *See* PE 107; PE 125. She also informed her chain of command that the Hispanic residents believed that correctional officers would not assist them when they needed help. PE 125 at 2; *see also* PE 145. She wrote: "The residents feel that they are being judged or

---

57. Chaplain Perez conceded on cross-examination that the passes requested by the inmates are being requested in a secure prison environment. TR at 218.

58. In making this finding of fact, the Court has carefully examined the exhibits offered by both parties, including a searching examination of PE 288A through 288FF, as well as consideration of the testimony of the witnesses who testified at trial, viewed in light of their demeanor and credibility. The Court most carefully considered the testimony of the plaintiffs' correctional expert on this issue and attempted to correlate his expert opinion with other evidence offered at trial. After evaluating Mr. Miller's expert opinion, which was based in part on interviews with inmates and staff and which, at times reflected multiple hearsay of questionable reliability, the Court has not adopted his opinion regarding the existence of a racially hostile environment.

59. As discussed *infra,* one notable exception may be the complaint by Ms. Iraheta against Cpl. Harper.

verbally denied because they are of Latino descent." *Id.* at 1. Other staff members have raised similar complaints. *See* PE 18; PE 160.

In attempting to meet their burden of proof to demonstrate a racially hostile environment, the plaintiffs offered reports by Department of Corrections' correctional officers which describe some of the incidents involving Hispanic inmates. The Court has closely examined each of the 31 incidents described in the exhibits offered by the plaintiffs. As can be gleaned from those exhibits, the vast majority do not identify the race of the assailants. And, although these exhibits detail the actions taken by DCDC officials to investigate alleged complaints, few provide clear evidence of *racial* violence.[60] The exhibits also reflect, in many cases, the disciplinary action taken by correctional officers against the alleged assailants. Frequently, those assaulting the Hispanic inmates were placed in administrative segregation. None of the exhibits demonstrates that the Department of Corrections ignored the Hispanic inmates' complaints or sanctioned their physical abuse by other inmates or correctional officers. A summary of each one of those exhibits follows:

● June 16, 1989: Hispanic inmate Sarria Hilario was stabbed multiple times by an unidentified inmate. During the investigation, the Hispanic inmate stated he could not identify his assailant. PE 288A.

● August 6, 1991: Hispanic inmate Gilberto Mendoza suffered head trauma and lacerations following an assault by another inmate. Mendoza stated that the other inmate had earlier approached his cell and made derogatory remarks regarding Mendoza's Spanish ancestry; when the cell doors were opened, Mendoza approached that inmate and the altercation followed. Medical care was provided to both inmates. After an investigation, both participants were disciplined for fighting. PE 228B.

● Sept. 2, 1991: Hispanic inmate Delasepada Aristores suffered a stab wound by a shank, and was kicked and beaten when four inmates attacked him. After an investigation, the assault was attributed by DCDC staff to a dispute regarding the telephone. PE 288C.

● Dec. 12, 1991: In a report entitled, *Apparent Ethnic Conflict*, an altercation involving a Hispanic and other inmates is described. After an investigation, DCDC staff attributed the fight to a dispute regarding a basketball game. PE 288D.

● Jan. 3, 1992: Hispanic inmate Jorge Ortiz and another inmate were involved in a fight; after an investigation, DCDC staff attributed the cause as relating to a football game. PE 288E.

● Sept. 14, 1992: Three correctional officers broke up a fight between Hispanic inmate Julio Gonzales and another inmate; after an investigation, the cause remained unidentified. PE 288F.

● Oct. 1, 1992: A Hispanic inmate at DC Jail was taken to DC General with lacerations to his left eye. During the investigation, he refused to identify his assailant. PE 288G.

● Dec. 1, 1992: While asleep, a Hispanic inmate at Central was attacked by other inmates, suffering a laceration to his cheek and multiple contusions around his head and scalp. The incident was referred to the FBI for investigation. PE 288I.

● Dec. 3, 1992: A Hispanic inmate at DC Jail reported an assault by another inmate. During the investigation, the Hispanic inmate claimed to have been punched in the face, neck and stomach for no reason by the other inmate. The actual cause of the incident was never identified. PE 288H.

● Jan. 18, 1993: A Hispanic inmate was placed in protective custody after another inmate "grabbed [him] in the bathroom of four dormitory and threw him against the wall and tried to sexually assault him." A

---

**60.** Except for a few instances, neither the reports nor other evidence at trial affirmatively identifies the race of those alleged to have assaulted Hispanic inmates. While the Court notes that most have non-Hispanic surnames, a name can be misleading. *See* PE 143 (IGP from Hispanic inmate named Brian Bennett). Even if the assailants' races are other than Hispanic, the plaintiffs have not carried their burden to demonstrate facts supporting the existence of a racially hostile environment.

second Hispanic inmate also was placed in protective custody. After an investigation, DCDC staff stated: "**It is recommended that [the assailant] be considered for a transfer to an environment where he can be closely monitored.**" PE 288J (emphasis added).

● Apr. 4, 1993: Reporting an assault on a Hispanic inmate by non-Hispanic: "I don't know why he hit me." The Hispanic inmate suffered a laceration. After an investigation, the other inmate was placed on administrative segregation. PE 288K.

● Apr. 18, 1993: Reporting the stabbing of a Hispanic inmate at DC Jail. During the investigation by correctional officers, the Hispanic inmate refused to identify his assailants. PE 288L.

● June 7, 1993: Reporting an assault on a Hispanic inmate by two assailants at DC Jail. During the investigation, the Hispanic inmate attributed the fight to the use of the phone.[61] PE 288M.

● Aug. 6, 1993: Reporting that correctional officers at DC Jail received a telephone call from a Hispanic inmate's girlfriend, who stated that the Hispanic inmate had been assaulted by two inmates, but he was unable to report it himself because of his inability to speak Spanish. After an investigation, the assailants were placed in administrative segregation. PE 288N.

● Aug. 17, 1993: Reporting an assault on a Hispanic inmate by two assailants at DC Jail. During the investigation, the Hispanic inmate identified the assailants, who were placed in administrative segregation. PE 2880.

● Aug. 20, 1993: Reporting a bed burning of a Hispanic inmate's bed at Occoquan by persons unknown while the Hispanic inmate was not present. During the investigation, the Hispanic inmate stated that he

did know why anyone would set fire to his bed. PE 288P.

● Sept. 13, 1993: Reporting an assault on a Hispanic inmate by an inmate at CTF; the correctional staff reported that the Hispanic inmate did not fight back. The cause was not identified. PE 288Q.

● Nov. 9, 1993: Describing an altercation between two Hispanic inmates and two African–American visitors to Minimum; after an investigation, it was determined that the incident stemmed from a pass made by one of the African-American visitors at the visiting wife of one of the Hispanic inmates. PE 288R.

● Nov. 10, 1993: Reporting an assault on two Hispanic inmates by two other inmates; one Hispanic inmate was stabbed in the lungs with a shank. After an investigation, the assailants were placed in administrative segregation and the FBI, among others, was notified. PE 288S.

● Dec. 2, 1993: Reporting that a Hispanic inmate was found in the "sallyport with blood running from his head" at DC Jail. During investigation, the inmate stated that he couldn't identify his assailant. PE 288T.

● Dec. 4, 1993: *Describing incident at Medium in which a Hispanic inmate threatened to stab another inmate with an ice pick.* The underlying cause of the incident was not identified. PE 288U.

● Dec. 13, 1993: Describing an incident at Medium in which a Hispanic inmate was hit in the back of the head with a sock containing a hard object by an unknown assailant; a Hispanic inmate who intervened was later placed in protective custody because "[t]**he board believe (sic) that Res. Suazo life is in danger because of his action.**" PE 288V (emphasis added).

---

61. Sgt. Broadnax reported the following to Warden Henderson:

> Once I arrived in the infirmary several attempts were made to question the resident. Due to his limited ability to speak and understand [E]nglish. It took some time to gather enough facts to get a complete picture. What I was able to gather was little or nothing. He was ask[ed] did he want to press charges against anyone. The reply after 15 minutes of

given (sic) him a picture of what I need to know, hand and arm signals was "No!" He signed a non-prosecution form and indicated that he did not know who hit him or what he was hit with. He further stated that he had no problems with anyone in the unit.

PE 288M (Memo from Sgt. Lee Broadnax to John Henderson, Administrator at Occoquan, dated June 7, 1993).

- Apr. 14, 1994: Describing an incident at DC Jail in which a Hispanic inmate was attacked by five "unidentified" masked assailants. The report indicates that the assailants remained unidentified. The Hispanic inmate was placed in protective custody. PE 288W.

- May 4, 1994: Reporting the bed burning of a Hispanic inmate at Occoquan only six days after he was transferred into that dormitory from another dormitory. During the investigation, Hispanic inmate stated that he had no idea why his bed had been set on fire. PE 288X.

- June 25, 1994: Memo from bilingual case manager discussing the bed burning of a Hispanic inmate in dormitory six and *stating her suspicion* that the cause was likely racial animosity. PE 288Y (emphasis added).

- July 22, 1994: Describing an assault on two Hispanic inmates by a group of Jamaican inmates following a soccer match. After investigation, various notifications were made including to the FBI. PE 288Z; PE 288AA.

- July 26, 1994: Describing an incident in which a Hispanic inmate was stabbed 18 times by two other inmates at DC Jail. An investigation was conducted, but the exhibit does not reflect the cause of the incident or the disciplinary action, if any, that was taken. PE 288BB.

- Oct. 14, 1994: Describing the stabbing of a Hispanic inmate by two other inmates in Dorm Seven at Occoquan. The Hispanic inmate requested a transfer due to fear of racial violence. **The Hispanic inmate was placed in protective custody.** The assailants were placed in administrative segregation. PE 288CC (emphasis added). Another inmate described this incident as being racially motivated. *See* Deposition of Victor Lugo, Dep. TR at 123–25 (Nov. 17, 1994).

- Nov. 9, 1994: Reporting the transfer request by a Hispanic inmate from Dorm One at Occoquan after finding his locker tampered with and evidence of an attempt to burn his bed. **Placed in protective custody.** PE 288DD (emphasis added).

- Dec. 10, 1994: Reporting the stabbing of a Hispanic inmate by another inmate; treated at Fairfax Hospital. After an investigation, the assailant was placed in administrative segregation. The FBI was notified of the incident. PE 288EE.

- May 15, 1995: Reporting the assault of a Hispanic inmate by an other inmate. An investigation was conducted, although the results of the disciplinary proceedings are unclear. PE 288FF.

These exhibits offered by the plaintiffs, describing 31 incidents over a period spanning approximately six years,[62] simply depict prison violence. While the violence inflicted upon Hispanic inmates by other inmates (usually of unidentified race) may sometimes have been racially motivated, the reports generally reflect that the defendant's correctional officers investigated and promptly took appropriate action based upon the individual circumstances of the case.[63] At times, pursuant to their request, Hispanic inmates were placed in protective custody. If anything, the reports reflect DCDC's sensitivity to the dangers faced by the Hispanic minority. Significantly, the reports indicate that correctional officers notified the appropriate authorities, including the FBI. There is no credible suggestion that, at least in the exhibits offered by the plaintiffs, the defendant's personnel acted improperly.

At trial, Hispanic inmates testified to assaults by other inmates. Martin Nunez described at trial the incident at issue in PE 288CC, when he was stabbed at Occoquan in 1994. TR at 137–43; *see also* PE 288CC. Nunez testified that upon returning from a class, he found that his locker had been broken into. TR at 137. He reported this to a correctional officer, whom at trial Nunez contended did nothing in response. *Id.* La-

---

**62.** This constitutes an average of approximately 5 incidents per year. While the Court has no way of knowing if this comprises the entire universe of assaults involving or directed at Hispanic inmates, the Court has considered the totality of the evidence offered by the plaintiffs.

**63.** While the plaintiffs have contended that DCDC correctional officers place Hispanic inmates in "protective custody" as punishment, they have not proven this assertion to be true.

ter, he reported the incident to his case manager and requested a transfer. Upon returning to his dorm, he was grabbed by a group of prisoners and stabbed by an African–American inmate, David Lee. TR at 138; PE 288CC. Nunez was taken to Fairfax hospital for treatment. Upon his return, he was placed in protective custody. TR at 138; PE 288CC.[64]

Jose Bonilla also testified that he was stabbed in the back by two black inmates while incarcerated at Maximum. TR at 118–19.[65] Bonilla testified that several months before the trial, he was assaulted by an African–American inmate who had previously articulated animus towards Hispanics. TR at 121–22.

William Alexander Lazo testified that three prisoners tried to kill him on December 25, 1994, but he failed to identify their race, and there is no suggestion in his testimony that their attempt to kill him was based on racial animus. TR at 95.

While the plaintiffs' expert on correctional issues testified that Hispanic inmates suffered bed burnings more than 10 times more frequently than other inmates, Miller Test. at 21 n. 28,[66] the motivation underlying those burnings (or the identities or races of the perpetrators) was not affirmatively established at trial. See TR at 471 (Miller testimony); PE 105; PE 145. In one memorandum, Ms. Iraheta reported only "rumors of racial animosity" and that the Hispanic vic-

tim of one bed burning incident was thought by other inmates to be a "snitch." PE 160 (memorandum to Warden Henderson, Occoquan, dated July 12, 1994). Similarly, although there was evidence of assaults on Hispanic inmates by DCDC correctional officers (also of unidentified race), see Miller Test. at 11–12; TR at 52–53, 83–84, the plaintiffs did not establish by a preponderance of the evidence that those assaults were the result of racial animus. Nor have they demonstrated that the assaults were pervasive and repeated.[67]

It was not disputed at trial that Hispanics inmates were sometimes called racially derogatory names like "spic," "amigo," "jumping bean," and "wetback" by inmates and certain correctional officers. See, e.g., TR at 117–18 (Testimony of Jose Bonilla); TR at 136–37 (Testimony of Martin Nunez); TR at 160–62 (Testimony of Jose Mejia); Benvanides Dep. TR at 125–26 & 134–35; Lugo Dep. TR at 115–17; Maldonado Dep. TR at 88–91; Redman Dep. TR at 123. Nor was it disputed that, on occasion, while African–American inmates are called by their real names, certain correctional officers (of unidentified race or ethnic origin) sometimes referred to Hispanic inmates as "Pedro" or "amigo." Miller Test. at 16.

Particularly troubling is the evidence of Corporal Victor Harper's inappropriate conduct.[68] Harper has been the subject of nu-

---

**64.** However appalling it is that he was later placed in the same cellblock as his assailant, see TR at 155–57, there is nothing to indicate that this was other than a grave mistake. When he brought this fact to the correctional officers' attention, it was corrected.

**65.** Bonilla did not identify when the incident occurred.

**66.** The plaintiffs' correctional expert testified that when an inmate or group of inmates set fire to an inmate's bed, the intended message is that the inmate should be moved to another dorm. Miller Test. at 21.

**67.** One troubling instance of a correctional officer misconduct was introduced not through the correctional expert or through testimony from someone with personal knowledge, but through the testimony of the plaintiffs' mental health expert. Dr. Oquendo testified that a correctional

officer assisted in the sexual assault of a Hispanic prisoner. Based on discussions with a different correctional officer and a staff psychologist, Dr. Oquendo stated that a correctional officer was persuaded to lock a non-Hispanic prisoner in the same cell with the Hispanic inmate whom the non-Hispanic inmate had previously assaulted. Oquendo Test. at 23 & nn. 10–11. Dr. Oquendo stated that during a four-hour period the Hispanic inmate was then physically and sexually assaulted. Id. While this incident is of great concern, the plaintiffs have not demonstrated that assault resulted from racial animus. Additionally, the lack of testimony by a witness with direct knowledge affects the weight of this evidence.

**68.** Although the evidence at trial was equivocal as to the remedial actions, if any, taken by the defendant, the alleged discriminatory conduct of Cpl. Harper deserves intense scrutiny by Department of Corrections' officials.

merous complaints and the record does not make clear what, if any, action the defendant has taken in response. In February of 1992, Hispanic inmate Victor Lugo brought Harper's racial animosity to the attention of corrections officials through his IGP,[69] alleging that Harper stole Lugo's identification and told him that "[a]migos are all alike[,] you all think you are slick." PE 37; *see also* PE 128.[70] Lugo testified regarding his concern of retaliation by Harper. *See* Lugo Dep. TR at 94; PE 37.

Later, in February of 1993, Hispanic inmate Jose Marcos Amaya complained that Harper denied him passes to use the law library and to see Sister Maria. PE 74. Amaya also alleged that Harper belittled him and treated him unfairly when he attempted to speak English.[71] DCDC officials received another complaint regarding Cpl. Harper when light-skinned Hispanic inmate Brian Bennett filed an IGP complaining of racial comments and asking to be transferred. PE 143.

DCDC staff also complained about Cpl. Harper's frequent and ongoing discrimination towards Hispanics. In February of 1994, Ms. Iraheta wrote to Bernard Braxton, through the chain of command, complaining of Cpl. Harper's treatment of both Hispanic inmates and staff. PE 124. The following month, she wrote to Warden Henderson regarding "the disparate [ ] treatment that His-

panics, inmates and employees, are subjected to by Corporal Victor Harper." PE 128. Ms. Iraheta specifically complained of harassment, threats and racial comments by Harper. *Id.* After receiving no response, she again wrote to Warden Henderson: "Over 60 days ha[ve] passed and I ha[ve] not received a response from you. Meanwhile, Corporal Harper's lack of professionalism has increased as well as the racial harassment incidents against Hispanic residents and myself" PE 130.[72]

Laura Colon raised the issue to Vernon Hawkins' attention:

> This memorandum is to inform you that Vilma Iraheta–Oliva is being harassed by Corporal Victor Harper because he feels that she is providing more services to Hispanic residents vs. African Americans.

> &ast; &ast; &ast; &ast; &ast; &ast;

> Any assistance that you can provide in this matter may not only help Ms. Iraheta and the resident, but perhaps to keep the Department of Corrections out of the newspapers.

PE 129 (Memo from Laura Colon to Vernon Hawkins, dated April 4, 1994).

The Department of Corrections investigated the complaint and, at least initially, found that it had merit. PE 131. Warden Henderson stated that "[a]ppropriate disciplinary action has been taken." *Id.* Howev-

---

69. Lugo wrote:

> The follwoing (sic) complaint is being filed against Cpl. Harper because of his unprofessionalism and his discrimination towards me because of my Hispanic decsent (sic).

> I have approximately been in dormitory # 06 for a month. Cpl. Harper has constantly threatnd (sic) and harassed me. I really did not pay it much attention, because I know that one of the methods used (by Correctional Officers) to orientate (sic) new residents is to intimidate them. Nevertheless, I believe Cpl. Harper stepped out of his bounds on 2–19–94. On 2–19–94 at 1:30 p.m., Cpl. Harper approached me and asked me for my I.D. Card. I handed him my I.D. he stated that I was in a no-smoking area. I said that "no one had informed me." He stated you "Amigos are all alike you all think you are slick."

> Cpl. Harper never has returned my I.D. When I approached him the next day to ask him for my I.D. he stated that he "did'nt (sic) have my mother-fucking I.D. to get out of his

face." I asked him was this a joke to him he stated "my eight hours is a joke."

> I have not asked hoim (sic) for my I.D. again because I am trying to avoid any altercation with this Correctional Officer.

PE 37.

70. The Department of Corrections investigated, but could not verify Lugo's allegations. The defendant reaffirmed its policy in its response to Lugo: "The type of behavior you described, including racial discrimination, is neither condoned nor allowed by the Department." PE 37.

71. An investigation was conducted and Amaya was told that the facts did not support his allegations. However, the Department also informed him that "all staff have been reminded to treat residents fairly." PE 74.

72. Ms. Iraheta was later transferred from Occoquan to the Youth Center after receiving an anonymous death threat. TR at 356–57.

er, Ms. Iraheta testified that Henderson rescinded his earlier finding without identifying the reason. *See* Iraheta Dep. TR at 269–70.[73] She also testified by deposition that she was not aware of any disciplinary action taken against Harper. *Id.*

Finally, the evidence introduced at trial established that Hispanic inmates were the victims of theft. *See, e.g.,* TR at 177–79; PE 82; PE 176; PE 180; Benavides Dep. TR at 127–31; Maldonado Dep. TR at 26. However, the plaintiffs did not affirmatively establish that these thefts were motivated by race or that Hispanic inmates suffered thefts disproportionately.

### III. Conclusions of Law

The plaintiffs have asserted claims alleging violations of the First, Fifth and Eighth Amendments to the Constitution, of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, of Title VI, 42 U.S.C. § 2000d, and of District of Columbia law. Each is dealt with below.

### A. Deliberate indifference to the medical and mental health care needs of plaintiffs.

The plaintiff class, Hispanic prisoners within the Department of Corrections institutions, are entirely dependent upon the District of Columbia to provide for their medical care and mental health care needs. *See In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890). If the District of Columbia fails to provide for those needs, they go unattended. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

■ Medical care is one of the core areas of the Eighth Amendment, *Ramos v. Lamm,* 639 F.2d 559, 566 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), and the constitutional duty to provide adequate medical care requires that the District "make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." *Ramos,* 639 F.2d at 574. This includes medical treatment for dental care, physical ailments and psychological or psychiatric care. *Id. See generally* John W. Palmer, *Constitutional Rights of Prisoners* § 10.3, at 188 (5th ed.1996).

■ Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription on cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05, 97 S.Ct. at 291. "[P]rison officials must ensure that inmates receive adequate … medical care." *Farmer v. Brennan,* 511 U.S. 825, 831–33, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). While allegations of medical malpractice or a misdiagnosis are not enough to state a claim of deliberate indifference, *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292; *Ramos,* 639 F.2d at 575, liability arises under the Eighth Amendment if the defendant knows that inmates face a substantial risk of harm and yet disregards that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan,* 511 U.S. at 846–48, 114 S.Ct. at 1984. Prison officials who act reasonably cannot be held liable under the Eighth Amendment; those who consciously disregard a substantial risk of serious harm can be. *Id.* at 838–40, 114 S.Ct. at 1980.

■ Whether a defendant possessed the requisite knowledge is a question of fact, and it can be inferred by circumstantial evidence. "For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the de-

---

**73.** The Court has no way of knowing what, if any, action the defendant actually took against Harper, because the plaintiffs did not offer the memo to which Ms. Iraheta referred in her deposition. Based upon PE 131, which stated that "disciplinary action *has* been taken" and Ms. Iraheta's uncorroborated statement that Henderson's finding was later rescinded, the record is equivocal.

fendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842–43, 114 S.Ct. at 1981–82. Actual harm is not required: the question is whether prison officials, acting with deliberate indifference, exposed a prisoner to a substantial risk of serious damage to his future health. *Id.* at 842–44, 114 S.Ct. at 1982.

 "Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos,* 639 F.2d at 575; *see Langley v. Coughlin,* 888 F.2d 252, 254 (2nd Cir. 1989). A medical need is serious if a layperson would recognize the need for a doctor's attention. *Ramos,* 639 F.2d at 575. Deliberate indifference also may arise from the failure to provide reasonably medical care to a prisoner or in an unreasonable delay in providing medical care. *Toombs v. Bell,* 798 F.2d 297, 298 (8th Cir.1986). Deficiencies in staffing or procedures that result in depriving a prisoner of reasonable medical care violate the Constitution. *Bass v. Wallenstein,* 769 F.2d 1173, 1186 (7th Cir. 1985); *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983); *Madrid v. Gomez,* 889 F.Supp. 1146, 1255–59 (N.D.Cal.1995); *see* Lynn S. Branham & Sheldon Krantz, *The Law of Sentencing, Corrections. and Prisoners' Rights* 496 (5th ed.1997) (citing cases).

 Systemic deficiencies in access to medical and mental health care may constitute deliberate indifference under the Eighth Amendment. *See, e.g., Eng v. Smith,* 849 F.2d 80, 82 (2nd Cir.1988); *Anderson v. City of Atlanta,* 778 F.2d 678, 686–87 (11th Cir. 1985). "In class actions challenging the entire system of health care, deliberate indifference to inmates' health needs may be shown by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff or by proving there are such systemic and gross deficiencies in

staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos,* 639 F.2d at 575; *see Wellman,* 715 F.2d at 272; *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1042 (S.D.N.Y.1995) *Madrid v. Gomez,* 889 F.Supp. at 1256; *Palmer, supra* § 10.3, at 186.

In this case, the plaintiffs have demonstrated overwhelmingly (and certainly by a preponderance of the evidence) that the defendant has been deliberately indifferent to the medical and mental health care needs of the plaintiff class. The plaintiffs have repeatedly shown that, for years (and at least since 1991 or 1992), Hispanic prisoners have not been provided adequate health care treatment and that the defendant had repeated notice of these problems. The plaintiffs have also demonstrated that the defendant's actual (not its written) policies and practices were the moving force denying Hispanic prisoners adequate medical treatment and placing them at substantial risk of serious harm.

As reflected in the findings of fact, the evidence at trial was replete with instances in which prison officials have exposed the plaintiff class to the substantial risk of serious harm. For example, a non-English speaking inmate who tested positive for HIV was advised of the results of his test by a monolingual English-speaking physician who simply told him, "positivo," without providing further counseling. Other examples of a substantial risk of serious arise where LEP Hispanic inmates have been unable to access the medical system to obtain medical care such as dialysis treatment or HIV testing and counseling. A serious and pervasive risk arises when LEP Hispanic inmates have been prescribed medication for physical or mental health conditions without having the treatment plan or the side effects of the medication explained to them due to the failure to have, or to use, bilingual medical staff It is difficult to conceive of an example of medical care system that can be more deliberately indifferent than one in which illnesses are diagnosed and medication is prescribed based upon the patient pointing to a region

of his or her body and saying the Spanish word for pain, "dolor."

Hispanic inmates have been, and are being, placed at substantial risk of serious harm due to structural deficiencies in the defendant's medical care system. These deficiencies include, at the core, the inmates' inability to communicate their medical problems because of the defendant's failure to provide sufficient bilingual staff or qualified translators for medical care encounters. *See Wellman*, 715 F.2d at 272; *Madrid v. Gomez*, 889 F.Supp. at 1256; Branham & Krantz, *supra at* 496 (citing cases). In medical care encounters, the plaintiffs have been forced to communicate through sign language, broken English or untrained, ineffective interpreters. *E.g.*, Fowlkes Test. at 10; Oquendo Test. at 7; TR at 96–97, 120, 121–123, 183–89. This fact, combined with repeated *notice of the problem, demonstrates* the defendant's deliberate indifference:

> An impenetrable language barrier between doctor and patient can readily lead to misdiagnoses and therefore unnecessary pain and suffering. This type of language problem which is uncorrected over a long period of time and as to which there is no prospect of alleviation, can contribute to unconstitutional deficiencies in medical care.

*Wellman*, 715 F.2d at 272.

At trial, the plaintiffs' expert on correctional mental health care explained why the use of unqualified interpreters at medical care encounters seriously threatens an inmate's health:

> The use of correctional officers, other prisoners, or untrained staff [as interpreters] except in an emergency is grossly inappropriate, dangerously inadequate and violates prisoners' rights to privacy in their mental health information . . . [I]nformation obtained from a non-English-speaking psychiatric patient through an untrained interpreter can be inaccurate and misleading. . . . Using other clients, or even staff members can lead to serious mis-communi-

cation and interfere with care. Common errors include such things as:

- omission, by which an interpreter completely or partially deletes a message sent by the speaker;
- addition, which is the tendency to include information not expressed by the speaker;
- condensation, which is the tendency to simplify and explain;
- substitution, which is the tendency to replace concepts; and
- role exchange, when the interpreter takes over the interaction and replaces the interviewer's questions with the interpreter's own, thus assuming the role of the interpreter.

Errors in translation can have deleterious effects on the communication between patient and clinician, making it distorted and obscured. A diagnosis and treatment intervention provided on the basis of misinformation can have serious consequences for the patient. For example, the seriousness of a patient's suicide intent can be minimized, or worse, missed, because the clinician was not able to follow subtleties in language and cues to gear the interview. Oquendo Test. at 19–20.

■ With only two bilingual medical care direct providers and one bilingual mental health provider, the defendant employs insufficient bilingual staff to service 150 LEP Hispanic inmates spread among eight institutions. To satisfy the Constitution, a medical facility must be adequately staffed. *Ramos*, 639 F.2d at 575; *Madrid v. Gomez*, 889 F.Supp. at 1257; *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1577 (D.Idaho 1984); *Lightfoot v. Walker*, 486 F.Supp. 504, 524–25 (S.D.Ill.1980). Nor can access to medical treatment be substantially delayed in a systematic manner due to inadequate staffing. *Hoptowit*, 682 F.2d at 1253; *Madrid v. Gomez*, 889 F.Supp. at 1257.

To address the deficiency of bilingual staff, the defendant has purportedly adopted a procedure for providing translators.[74] However,

---

**74.** The defendant's recruiting of bilingual staff, like its approach to other aspects of these issues, has been, at best, relaxed. *See, e.g.*, Vazquez

Dep. TR, *passim* (Dec. 16, 1994) (deposition testimony of defendant's representative on recruiting correctional officers and staff); TR at 1001 &

the evidence at trial established that this policy is honored in the breach, and the nature of the underlying problems has been communicated to high levels within the DCDC system. The evidence at trial indicated that a majority of the medical staff was unfamiliar with the purported procedure, and there is scant evidence in the record as to compliance by medical staff.[75] Contrary to the defendant's concession that 80 percent of Hispanic inmates are limited-English proficient, Department of Corrections' medical care staff display a chronic and pervasive attitude that LEP Hispanic inmates possess a proficiency in English sufficient to allow meaningful health encounters. This has resulted in deficient medical treatment for LEP Hispanic inmates, placing them at substantial risk of serious harm in violation of the Eighth Amendment.

■ The normal and actual practice employed by the defendant, the use of correctional officers and other inmates, has also led to unjustified violations of LEP Hispanic prisoners' right to medical confidentiality. While the right to confidentiality of medical communications is qualified in a prison setting, *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir.1995); *Doe v. City of New York*, 15 F.3d 264, 267 (2nd Cir.1994); *F.E.R. v. Valdez*, 58 F.3d 1530, 1535 (10th Cir.1995); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577–80 (3rd Cir.1980), a prisoner's right to privacy is only limited by valid penological interests. *Anderson v. Romero*, 72 F.3d at 522 (citing cases). Outside of emergencies, however, there is no valid penological justification for disclosing an inmate's medical condition through the use of correctional officers or other inmates as interpreters in medical encounters. *See id;* Palmer, *supra* § 10.3, at 188.

■ Other systemic deficiencies include the failure to identify LEP Hispanic prisoners who are in need of services, such as HIV treatment and prevention as well as mental health counseling. A correctional facility must provide health care screening to identify potential medical problems and communicable diseases, *Hoptowit,* 682 F.2d at 1253; *Lareau v. Manson,* 651 F.2d 96, 109 (2nd Cir.1981); *Madrid v. Gomez,* 889 F.Supp. at 1257, and medical records must be marked and sufficiently organized to allow the provision of adequate care. *Hoptowit,* 682 F.2d at 1253; *Madrid v. Gomez,* 889 F.Supp. at 1258.

■ Systemic failures in the area of mental health medical care include the failure to make necessary and appropriate treatment available to Hispanic prisoners; the failure to monitor properly Hispanic inmates who receive mental health care to ensure continuity of treatment; and the failure to obtain informed consent prior to the administration of psychiatric medication. Finally, the evidence at trial firmly established that the defendant knowingly disregarded the substantial risk of serious harm to the plaintiff class. Accordingly, the Court finds that the defendant's failure to provide qualified interpreters for medical and mental health care encounters rises to the level of deliberate indifference and violates the Eighth Amendment to the Constitution.

■ However, the plaintiffs' claim for injunctive relief under D.C.Code § 24–442 [76] will be rejected. While this provision has been construed to extend the common law of torts to prisoners, *see District of Columbia v. Mitchell,* 533 A.2d 629, 648 (D.C.1987), it is not settled that it allows for the injunctive relief that the plaintiffs seek. *Women Pris-*

1007–08 (LEP coordinator, Laura Colon, had no personal knowledge of defendant's recruiting efforts).

**75.** Similarly, the defendant claims to have adopted a procedure involving the AT & T language line. However, as with the written policy on obtaining interpreters, the medical staff were generally unfamiliar with this mechanism. As with the written policy, the AT & T language line appears to be little more than window dressing.

**76.** The statutory provision provides, in relevant part:

Said Department of Corrections ... shall ... be responsible for the safekeeping, care, protection, instruction and discipline of all persons committed to [D.C. correctional] institutions. The Department of Corrections shall have the power to promulgate rules and regulations for the government of such institutions and to ... classify the inmates, and to provide for their proper treatment, care, rehabilitation, and reformation.

oners of the D.C. Department of Corrections v. District of Columbia, 93 F.3d 910, 923 (D.C.Cir.1996). Accordingly, and because federal courts are obligated to exercise restraint in such circumstances, this Court will decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) over this D.C. law claim. See Women Prisoners, 93 F.3d at 923.

### B. Access to Educational and Vocational Programs.

The plaintiffs contend that the defendant has violated their constitutional rights to due process and equal protection under the Fifth Amendment, and their statutory rights under 42 U.S.C. § 2000d [77] (Title VI), by failing to provide vocational, educational and rehabilitative programs in the Spanish-language. While the record affirmatively establishes that the defendant offers few courses to LEP Hispanic prisoners, and even fewer still by which LEP Hispanic inmates may acquire "good time" credits, the plaintiffs have failed to establish a constitutional violation.

The plaintiffs clearly have no constitutional right to vocational, rehabilitative or educational programs. See, e.g., Women Prisoners, 93 F.3d at 927; Inmates of Occoquan v. Barry, 844 F.2d 828, 836 (D.C.Cir.1988); Garza v. Miller, 688 F.2d 480, 485 (7th Cir.1982); Hoptowit, 682 F.2d at 1255. See generally Palmer, supra § 10.2, at 178. Nor do prisoners have a property interest in parole that is recognized under the Fifth Amendment. See Sandin v. Conner, 515 U.S. 472, ——, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995) (protected interests are "generally limited to freedom from restraint which, while not exceeding the sen-

tence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life") (citations omitted); Greenholtz v. Inmates of Nebraska Panel & Correctional Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979) (mere existence of a parole system does not create a liberty interest protected under the Due Process Clause of the Fifth Amendment); Ellis v. District of Columbia, 84 F.3d 1413, 1420 (D.C.Cir.1996) (parole regulations do not create a liberty interest in parole); Price v. Barry, 53 F.3d 369, 370 (D.C.Cir.1995) (D.C.Code does not create a liberty interest in parole).

The aforementioned cases state the binding law today. However unfair this Court may find the result in this case to be, there is no cognizable property interest in "good time" credits merely because those credits factor into potentially favorable parole determinations (to which we are told the plaintiffs have no constitutional right) as the end product of programs (to which we are told they are not constitutionally entitled).[78] While an LEP Hispanic prisoner may be at a disadvantage in earning good time credits based upon the programs currently offered by the defendant, under the current state of the law, that disadvantage does not translate to a due process violation.

Nor has the defendant violated the Equal Protection Clause of the Fifth Amendment. While the plaintiffs have a right to be treated equally, the record as a whole establishes that the District of Columbia does not deny them access to any programs because

---

**77.** This provision provides:

No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**78.** The cases cited by the plaintiffs in support of their position are not to the contrary. In the pre-Sandin, pre-Price and pre-Ellis case of Moss v. Clark, 698 F.Supp. 640 (E.D.Va.1988), the court held that a prisoner has a property interest in "good time" credits because the award of such

credits is virtually mandatory under the language of the applicable statute once the prisoner completes the academic or vocational program that is available. 698 F.Supp. at 653. And, in Gotcher v. Wood, 66 F.3d 1097 (9th Cir.1995), a post-Sandin case, the Ninth Circuit held that an inmate has a liberty interest in "good conduct time credits" under Washington state law. 66 F.3d at 1099 (emphasis added). Simply put, neither Gotcher nor Moss stand for the proposition that the defendant is constitutionally required to offer specific courses to inmates based on their lack of proficiency in the English language.

*they are Hispanic.* All programs are open to all inmates, although an individual's English language proficiency can limit the fact or degree of participation.

The evidence at trial established that the defendant provides approximately seven percent of its programing in the Spanish language, even though the LEP Hispanic population comprises less than two percent of the prison population. While the quantity of programs in the Spanish-language have suffered disproportionate cuts in the recent past, the evidence does not show that these programmatic cuts were made for invidious reasons. Instead, the record supports the defendant's articulated reason that any reductions were budgetary in nature.

 While the record at trial demonstrated that the defendant does not offer the same programs in Spanish that it offers in English, these programming decisions do not constitute a denial of equal protection under the Fifth Amendment.[79] Of course, a denial of equal protection and a violation of Title VI would result were prison programs offered based upon an inmate's race or ethnic origin. That, however, is not this case. All programs are available to all inmates. To the extent that LEP Hispanics are unable to participate in meaningful sense in English-language programs, those LEP Hispanic inmates are differently situated for equal protection purposes. The Court of Appeals has instructed that a program-by-program comparison of offerings to different groups does not, by itself, establish an equal protection violation—particularly where the programs are tailored for groups that are not similarly situated. *See Women Prisoners,* 93 F.3d at 926–27.

 The plaintiffs' claim under Title VI fails for the same reasons: the LEP Hispanic inmates are not being barred from participation in prison programs because of their race, color or national origin. While the programs are open to all inmates, limited-

English proficient inmates' participation is limited only by their English fluency. Simply put, LEP inmates are differently situated than inmates who are fluent in English.

 While it may be penologically sound and even highly desirable for the defendant to offer identical programs to every language group confined within the walls of its prisons, neither Title VI nor the Constitution require it to do so. The defendant simply cannot discriminate for an illegal reason and, here, the plaintiffs have not shown that it has.

**C. Failure to Provide Interpreters at Hearings.**

 The defendant's failure to provide qualified interpreters at disciplinary hearings and parole hearings is an affront to due process. If due process means anything at all, it provides constitutional protection of the right to participate *meaningfully* in critical proceedings. For due process to be satisfied in the prison setting, an inmate must be provided notice of charges, must have the right to call witnesses and present evidence on his or her behalf, and the inmate must be provided with written findings. *Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974) (cited with approval in *Sandin v. Conner,* 515 U.S. 472, ——, 115 S.Ct. 2293, 2296, 132 L.Ed.2d 418 (1995)). For this procedural regime to be meaningful, it should be obvious that the prisoner must be able to understand the proceedings and participate on his or her own behalf. Non–English speaking prisoners who are not provided with qualified interpreters at any of these critical stages of the discipline proceedings or during parole proceedings are denied due process of law

> Unless Spanish speaking inmates understand and can communicate with the hearing board, they are being denied the due process protections guaranteed in Wolf. Therefore, we find that due process requires that Spanish speaking inmates who

---

**79.** It is questionable whether the defendant's programming allocations support the plaintiffs' argument. While programs in the Spanish-language may have suffered greater reductions than the programs conducted in the English-language, the evidence at trial made clear that, when compared to the percentage of Hispanics in the prison population, the defendant apportions a greater *pro rata* percentage of its resources, however meager, for LEP Hispanic inmates than it does for other inmates.

cannot read and understand English must be given notice and statements in Spanish or provided with a translator, who should be present at the hearing in any case. *Powell v. Ward,* 487 F.Supp. 917, 932 (S.D.N.Y.1980), *modified,* 643 F.2d 924 (2nd Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981).

 While prisoners may have no liberty interest in parole *per se, see Sandin v. Conner,* 515 U.S. at ——, 115 S.Ct. at 2300, that is not say that inmates can be deprived of a fair hearing once the District of Columbia determines that a hearing will be held. To hold otherwise would sanction parole proceedings that lack fundamental fairness and constitutionally minimal protections. Once the defendant decides to conduct a parole hearing, due process demands that the hearing be conducted in a fair and meaningful manner. *See Bonner v. Arizona Dept. of Corrections,* 714 F.Supp. 420, 425–26 (D.Ariz. 1989). This requires that qualified interpreters be provided for hearings for non-English speaking prisoners.[80]

The lack of interpreters and documents translated into Spanish at these critical hearings has long been known to the defendant. *See, e.g.,* PE 66; PE 299; TR at 950 & 982 (testimony of Laura Colon); PE 72; PE 125; PE 144; PE 145. Nevertheless, despite its purported policy to provide interpreters, *see* PE 256, the defendant's practice to do so has been, at best, haphazard. And, the record at trial established that the plaintiff class has been adversely affected by the defendant's failure to comport with fundamental principles of due process and with its own written "policy." *See, e.g.,* TR at 234–36; TR at 180–81. Such failure is astonishing not only because this constitutes the constitutional floor in terms of due process, but because, at least on paper, the District of Columbia has clearly recognized that providing interpreters at these hearings is "essential." *See* PE 256 at 1.

## D. Religious Programs and the Free Exercise Claim.

 The plaintiffs contend that the defendant's failure to provide religious services has violated their rights under the First Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb.[81] The claim is rejected, because the evidence at trial did not demonstrate that the defendant has substantially burdened the plaintiffs' exercise of religion under RFRA or the First Amendment.[82]

 The District of Columbia has recognized the importance of religious programs to Hispanic prisoners, *see, e.g.,* PE 23; PE 154, a recognition that is fully consistent with the law in this area: Once "society has removed the prisoner from the community where he could freely exercise his religion, it has an obligation to furnish or supply him with the opportunity to practice his faith during confinement." *Gittlemacker v. Prasse,* 428 F.2d 1, 4 (3rd Cir.1970).

 To demonstrate a free exercise violation,

the religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion ... by preventing him or

---

**80.** One court has correctly noted:
As a legal standard by which to measure the question of "fairness," respondent is entitled to deem a hearing conducted entirely in English to be fair only where the parole applicant demonstrably understood clearly the questions and comments directed to her, in English, during the course of the hearing, *and* where the parole applicant further demonstrably gave responses, in English, that adequately addressed the subject matter presented to her and that were understood by members of the Parole Board who conducted the interview.
*Labbe v. Russi,* 158 Misc.2d 532, 601 N.Y.S.2d 643, 647 (N.Y.Sup.Ct.1993) (emphasis in original).

**81.** In relevant part, this statute provides that

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except ... if it demonstrates that application of the burden to that person(1) is in furtherance of a compelling government interest and (2) is the least restrictive means of furthering that compelling governmental interest.
42 U.S.C. §§ 2000bb–1(a), (b).

**82.** Under RFRA, "the term 'exercise of religion' means the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb–2.

her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.

*Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir. 1995) (quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom. Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989)).

Here, the evidence demonstrated that the defendant has neither prohibited or substantially interfered with the exercise of the plaintiffs' religion. Instead, the evidence at trial does not show that, to the extent volunteer services are available, the Department of Corrections fails to make space and time available for those services consistent with its security needs.

The plaintiffs' principal complaint is about a lack of Spanish-language religious services.[83] However, the defendant here does not provide funding for religious services— all religious services are provided through volunteers. The evidence at trial makes clear that the primary limitation on the services available—including the Eucharist portion of the Spanish-language Mass at Occoquan—is the availability of bilingual priests (or ministers) who are willing to volunteer their services. The record contains no evi-

dence that the defendant has barred any volunteer services, once offered.

■ The plaintiffs also complain that the defendant does not cooperate with the Chaplain Perez and the Catholic religious program. Chaplain Perez testified to instances in which prison administrators were slow in responding to his administrative requests, but there was very general testimony by the Chaplain that inmates did not always receive passes to attend services.[84] It is understandable that Chaplain Perez is enthusiastic about his program, but it is only one of many issues before prison administrators on a daily basis. Moreover, prisons are secure environments, and security clearances must be processed carefully and passes issued consistent with these security needs. *Compare* TR at 209 (Chaplain Perez discussing delays in obtaining access to certain prison facilities).[85] Additionally, the evidence does not demonstrate that the time and place restrictions on the services at Occoquan, Central and Medium are unreasonable. *See Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995). RFRA simply does not require that inmates be provided with every religious service that they request. Nor did the evidence at trial demonstrate a violation of the First Amendment's free exercise clause.

In sum, the plaintiffs have not made the required threshold showing of the existence of substantial interference with the right of free exercise. *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995). Nor have they demon-

---

83. The plaintiffs point out that more English-speaking services are available. *See* PE 294. That appears to be correct. However, that alone, particularly when the English-speaking population comprises over 95 percent of the prison population does not state an actionable First Amendment or RFRA claim. There is no evidence in the record that the defendant denies the plaintiffs an opportunity to attend Catholic masses. There is evidence, however, that Spanish-speaking priests and ministers are not available to volunteer their services. This is not a sufficient basis to establish either a RFRA violation or municipal liability under Section 1983.

84. The basis for Chaplain Perez's knowledge was not made clear at trial. The plaintiffs did not describe specific instances in which a prisoner was denied a pass nor did any of the inmates who testified complain about being denied access

to religious services. However, LEP Hispanic inmate Jose Ramos, an inmate who attends religious services in English, testified:

> Q: Do you participate in any religious services?
> A: Yes.
> Q: What do you go to?
> Q: On Wednesdays, I go, and I go to the American service every night, you know, the one in English.
> A: Why do you go to the English services?
> Q: Because for God there are no languages, except the faith that you carry in your heart.
> Ramos Dep. TR at 52.

85. While the defendant could perhaps be more efficient or competent in dealing with religious volunteers, neither inefficiency or incompetence constitute a sufficient basis for a violation of RFRA or the First Amendment.

strated that the defendant substantially burdened the exercise of their religion by preventing the active participation in religious services or by denying them a reasonable opportunity to engage in activities that are fundamental to their religion. *See Werner,* 49 F.3d at 1480.

### E. Racially Motivated Violence and Harassment.

 Next, the plaintiffs have asserted a claim under 42 U.S.C. § 1983 for alleged violations of the Eighth Amendment stemming from a racially hostile environment. Like medical care, personal safety is one of the core areas of the Eighth Amendment. *Ramos,* 639 F.2d at 566. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. at 828, 114 S.Ct. at 1974, and officials must "take reasonable measures to guarantee the safety of inmates." *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). This includes a prison official's duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir.), *cert. denied,* 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988)); *see also Morgan v. District of Columbia,* 824 F.2d 1049, 1057 (D.C.Cir. 1987); *Ramos,* 639 F.2d at 572.

 To establish a violation under 42 U.S.C. § 1983, the acts of a single official with final policymaking authority can be sufficient to establish municipal liability under Section 1983. *City of St. Louis v. Praprotnik,* 485 U.S., 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). Whether a particular person has "final policymaking authority" is a question of District of Columbia law. *Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989). Additionally, municipal liability may arise if the plaintiffs demonstrate that the racially discriminatory conduct of which they complain is sufficiently pervasive to establish a policy or custom. *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

 While the law is clear, the problem faced by the plaintiffs here is one of a failure of proof. The plaintiffs have simply not met their burden to demonstrate by a preponderance of the evidence that the substantial majority of incidents upon which they rely to establish a racially hostile environment were, in fact, racially motivated. Nor have they shown that final policymakers were deliberately indifferent to racial violence against Hispanics by other inmates or correctional officers. At most, they have established that prisons are filled with violent inmates of various races (and who may be racist in their beliefs and in their conduct), and that certain correctional officers have occasionally engaged in inappropriate, but isolated, conduct.

Neither have the plaintiffs met their burden to demonstrate deliberate indifference as to training or as to reasonable precautions with regard to the safety of Hispanic inmates. In fact, the evidence offered by the plaintiffs frequently demonstrates that correctional officers acted promptly to investigate incidents involving Hispanic prisoners and took appropriate action thereafter.

 While the plaintiffs have identified several disturbing incidents involving correctional officers, in particular Corporal Harper, these isolated incidents are not sufficient to establish municipal liability. Considering the record as a whole, and in light of the credibility and demeanor of those witnesses who testified before the Court, the plaintiffs have not demonstrated that the defendant has failed to take appropriate action to protect the plaintiff class from harm at the hands of other inmates. While this is not to say that the defendant has established an enviable record, the evidence at trial demonstrated neither the existence of a racially hostile environment nor that the District of Columbia has been deliberately indifferent to the safety and security needs of the plaintiff

class.[86]

### F. D.C. Human Rights Act

 Finally, in Count Eight of their Amended Complaint, the plaintiffs have asserted a claim under the D.C. Human Rights Act, D.C.Code §§ 1–2501, *et seq.* Assuming without deciding that the Act even applies in the prison context, as discussed above, the plaintiffs have failed to prove the existence of a racially hostile environment or that the defendant's programming or other decisions were based on the Hispanic plaintiffs' race or national origin. Due to this failure of proof, judgment will be entered in favor of the defendant on Count Eight.

### IV. Conclusion

Accordingly, it is hereby

**ORDERED** that, in accordance with Fed. R.Civ.P. 58, judgment shall be entered in favor of the plaintiffs on Count One, in part, of the Amended Complaint (denial of medical and mental health care under the Eighth Amendment); on Count Two (confidentiality of medical information under the Fifth Amendment); on Count Three (due process in disciplinary hearings under the Fifth Amendment); and on Count Four (due process in parole hearings under the Fifth Amendment); it is

**FURTHER ORDERED** that, in accordance with Fed.R.Civ.P. 58, judgment shall be entered in favor of the defendant on Count One, in part, of the Amended Complaint (D.C.Code § 24–442); on Count Five (denial of access to programs); on Count Seven (racially hostile environment); and on Count Eight (violation of the D.C. Human Rights Act);[87] and it is

**FURTHER ORDERED** that the defendant shall file, on or before **May 16, 1997,** a memorandum proposing a plan to remedy the constitutional violations identified herein; the plaintiffs' memorandum in response shall be filed on or before **June 2, 1997;** and the defendant's reply is due on **June 10, 1997.**

Upon completion of the briefing, the Court will determine the relief that is appropriate pursuant to the Prison Litigation Reform Act, Pub.L. No. 104–134, 110 Stat. 1321 (Apr. 26, 1996), *codified at* 18 U.S.C. § 3626.

IT IS SO ORDERED.

---

86. For the reasons previously articulated, this Court will not exercise supplemental jurisdiction over the claim asserted under D.C.Code § 24–442. *See supra* (citing *Women Prisoners,* 93 F.3d at 923).

87. Count Six (denial of access to the courts) was withdrawn after trial.